STATE OF NORTH CAROLINA, EX REL UTILITIES COMMISSION AND PUBLIC SERVICE COMPANY OF NORTH CAROLINA v. CITY OF DURHAM, SANFORD BRICK & TILE COMPANY, TRIANGLE BRICK COMPANY, BORDEN BRICK COMPANY, CHEROKEE BRICK COMPANY, LEE BRICK & TILE COMPANY AND CHATHAM BRICK & TILE COMPANY

No. 61

(Filed 13 December 1972)

1. Gas § 1; Utilities Commission § 9— natural gas rate case — reversal by Court of Appeals — effect

Judgment of the Court of Appeals in a natural gas rate case reversing the order of the Utilities Commission, rather than remanding the case for further action, is in effect a denial of all rate increases sought by the natural gas company and requires the company to refund the interim rate increases which had been in effect for some two years.

2. Utilities Commission § 6— public utility rates — past service

The Utilities Commission may not fix rates retroactively so as to make them collectible for past service. G.S. 62-136.

3. Gas § 1; Utilities Commission § 6— natural gas rates — increase in cost of gas to company — Commission order

The Court of Appeals erred in reversing the portion of a Utilities Commission order allowing a natural gas company to increase its rates to the extent necessary to offset an increase in the cost of gas to it.

4. Utilities Commission § 6— public utility rates — test period

For the purpose of making the required estimates of a public utility's revenues and operating expenses, the proper procedure is for the Utilities Commission to fix a test period of twelve months, ending, as close as practicable, before the opening of the rate hearing.

5. Gas § 1; Utilities Commission § 6— natural gas rates — test period — abnormal temperatures — adjustment in revenues

Where the evidence in a natural gas rate hearing is clear and undisputed that the heating season of the test period was abnormally cold or abnormally warm, the Utilities Commission is authorized, if not required, by G.S. 62-133(b)(2) to make a reasonably appropriate adjustment of the test period revenues for the abnormality in the test period experience.

6. Utilities Commission § 6— rate hearing — review of findings

The credibility of testimony and the weight to be given it in a public utility rate case are for the Utilities Commission, not for the reviewing court, and its findings of fact supported by competent, material and substantial evidence are conclusive on appeal.

Utilities Comm. v. City of Durham

7. **Gas § 1; Utilities Commission § 6— natural gas rates — fair value of company's properties**

   The record does not support protestants' contention that the Utilities Commission arbitrarily determined the fair value of a gas company's properties by adding 20% to its figure for the original cost of the properties.

8. **Gas § 1; Utilities Commission § 6— failure to find replacement cost — harmless error**

   While the Utilities Commission erred in failing to set forth its finding of replacement cost less depreciation of a public utility's properties, such error was not prejudicial.

9. **Gas § 1; Utilities Commission § 6— natural gas rates — fair rate of return**

   The Utilities Commission did not err in finding that the rate of return earned by a natural gas company in the test period on the company's net investment in its properties was 7.27% and that such return was insufficient.

APPEAL by the Utilities Commission and the Public Service Company of North Carolina, hereinafter called Public Service, from the Court of Appeals, which reversed the order of the Commission permitting Public Service to increase its rates for natural gas.

On 31 July 1970 Public Service petitioned the Commission for authority to increase its several schedules of rates on the ground that the rates then in effect did not yield a fair return on the fair value of the company's properties. The increases then proposed were not uniform among the several classes of users, either in amount or percentagewise. The City of Durham intervened in opposition. The Commission designated the proceeding a general rate case and set it for hearing.

Prior to the hearing, Public Service filed another petition alleging that its sole source of natural gas, Transcontinental Gas Pipeline Corporation, hereinafter called Transco, had, with the tentative approval of the Federal Power Commission, increased its rate to Public Service. This petition sought authority to pass on such increased cost of gas to all classes of customers of Public Service, uniformly, by increasing their respective rates by the exact amount of the increase by Transco in its rate. Before the Commission could act, Transco put into effect a further increase in its rate to Public Service. Thereupon, Public Service amended its second petition to request like authority to pass along to its customers, uniformly, the exact amount of this increase also. Again, the City intervened in opposition.

The Utilities Commission consolidated the two proceedings for hearing, which began 9 March 1971, at which time certain brick manufacturers, to whom Public Service supplies gas for industrial use on an interruptible basis, were permitted to intervene as protestants. On 27 May 1971 the Commission entered its order allowing Public Service to increase its rates by amounts varying among the schedules applicable to the several classes of its customers, both in amount and in percentage of increase, the greatest percentage of increase being in the schedule applicable to interruptible industrial users. The increases so authorized included the full recovery of the additional cost of gas due to Transco's actions, $1,652,003, and approximately 50%, $1,445,168, of the increases sought by Public Service in the original proceeding designed to raise its rate of return.

The protestants appealed to the Court of Appeals, where the appeal was docketed on or about 20 October 1971, and the filing of briefs was completed on or about 15 February 1972. They made five assignments of error, summarized as follows: (1) The Commission's finding of the fair value of the properties of Public Service is arbitrary, excessive and contrary to the evidence, being reached by arbitrarily increasing the net investment of the company in the properties by 20%; (2) the Commission's finding that, without any increase, the rate of return of Public Service on its net investment was 7.27% and was insufficient is, in both respects, contrary to the evidence; (3) the Commission's finding that the increases approved by it would result in a return to Public Service upon its common equity of 16.5% is arbitrary and not supported by the evidence, the correct figure being 19.5%, which is excessive; (4) the Commission's finding that its distribution of the increase among the several rate schedules is just and reasonable is arbitrary and unsupported by the evidence, the increased rates, approved by the Commission, being excessive and discriminatory; and (5) the Commission's finding that a *pro forma* decrease in the revenues actually received by Public Service during the test period should be made, due to abnormally cold weather, is arbitrary, unsupported by the evidence and is not permitted under the laws of North Carolina.

On 30 August 1972 the Court of Appeals filed its opinion which, in its entirety, reads:

"This appeal calls for a review of a decision of the North Carolina Utilities Commission in a general rate-making case. See G.S. 7A-30(3).

"Appellants' assignments of error numbers 1, 2, and 5 are sustained. The order appealed from is Reversed."

On 8 September 1972 Public Service and the Commission appealed to this Court. Oral argument was had on 14 November 1972.

The Commission's findings of fact pertinent to this appeal are:

"(4) Under its present rates, Applicant realized for the test period operations approximately $33,878,156 in gross operating revenues. Applicant's reasonable operating expenses for that period amounted to $29,169,955.

"(5) The Commission finds that the fair value of the Applicant's properties used and useful in rendering the natural gas service it affords to its North Carolina customers, considering original cost less depreciation, and replacement cost by trending original cost to current cost levels, is $79,272,908.

"(6) Applicant's net operating income for return at the end of the test period after applying a customer annualizing factor of 2.55% is $4,828,260, resulting in a rate of return on net investment prior to consideration of the increases requested herein of 7.27%, which the Commission deems insufficient considering the Applicant's current operation [sic] conditions.

"(7) The rate of return deemed necessary on the fair value of its properties, with sound management, to produce a fair profit for its stockholders, considering economic conditions as they exist and permitting Applicant to maintain its facilities and service and to compete in the market for capital funds, thereby fulfilling its obligations to its customers, is 6.66%, which said rate of return on fair value will afford the Applicant an opportunity to realize additional annual gross revenues of approximately $3,097,-171. The Commission deems this amount of dollar return to the Applicant to be sufficient for it to compete in the market for capital funds on a reasonable basis.

"The total increases granted by this Order amount to 67.12% of the increases requested by the Applicant in this proceeding, including the cost of purchased gas in-

creases. Excluding the cost of purchased gas, which said increases amount to $1,652,003, this Order affords to Applicant approximately $1,445,168 in additional annual gross revenues in its general rate request * * * .

"(9) The additional revenues provided by the increases herein will result in a return on common equity to the Applicant of approximately 16.5%.

"(10)   After consideration of the increases allowed by this Order, Applicant's net investment in utility plant of approximately $66,060,757 when related to its projected net operating income for return of $5,279,671 after consideration of the customer annualizing factor, produces a return on net investment to the Applicant of approximately 7.99%.

"(11)  * * * The increases granted herein are deemed to be just and reasonable and result in a fair and equitable rate distribution among the classes of Applicant's customers.

"(13) The record in this case indicates that the weather for the test period ending September 30, 1970, was significantly colder than normal. The Commission finds that an adjustment should be made to reflect normal weather conditions, thereby making the test period more representative. The adjustment to reflect normalized weather has been computed by the Applicant and the Commission Staff, utilizing substantially the same method and the same base period as hereinabove described. The adjustment by the Commission Staff to Applicant's revenues because of abnormal weather conditions is just and reasonable and is adopted by the Commission in this Order."

Prior to the hearing, the Commission permitted Public Service to put its proposed rate increases into effect upon its undertaking to make refunds, with interest, of any such portion thereof as might not be allowed in the final order.

Commissioners Wells and McDevitt dissented from the making of the *pro forma* adjustment to test period revenues due to cold weather and from the allowance of that portion of the increase designed to raise the company's rate of return. Neither Commissioner Wells nor Commissioner McDevitt dis-

sented from the allowance of so much of the increase as was designed to offset the added cost of gas by virtue of the actions of Transco.

At the hearing before the Commission, voluminous statistical exhibits and oral testimony were introduced by Public Service and by the Commission Staff. The City introduced three exhibits relating to service agreements between Public Service and Transco which are not germane to this appeal. No other evidence was offered by the intervening protestants.

The substance of the evidence for the company, pertinent to this appeal, is as follows:

The company's last previous general rate hearing was in 1960. Approximately 70% of the company's investment in plant has been made since 1960. But for intervening inflation, the original cost, less depreciation, would be the approximate present fair value of its properties.

Public Service is not able to obtain from Transco enough gas completely to supply the desires of all its industrial customers in addition to the demands of its residential, and other firm customers, for heating and other uses. Consequently, in extreme cold weather, in order to supply the needs of its heating customers, it must divert gas to them from its interruptible industrial customers. Since the interruptible customers pay at a substantially lower rate than the firm customers, gas so diverted in periods of extreme cold weather yields to Public Service greater revenues than it would have received in such period had the weather been normal. By reason of the limited total supply of gas, all of the gas available to Public Service is sold regardless of weather conditions. The only effect of cold weather is to increase the volume sold to firm customers at the higher rates and decrease the volume sold to interrruptible customers at the lower rates. Thus, in a period of intensely cold weather, the total revenues received by Public Service are abnormally large. The reverse is true in periods of abnormally warm weather in the heating season. For this reason, the company's accountant made a *pro forma* subtraction of $944,674 from its revenues actually received in the test period.

The total impact of the two rate increases by Transco increased the cost of gas to Public Service by approximately $1,700,000 per year.

The original cost of the plant in service at the end of the test period, exclusive of construction work in progress, was $77,550,108, the accumulated reserve for depreciation $13,600,-809. The total net investment, plus materials and supplies and cash-working capital, was $67,418,630.

Operating revenues actually received during the test period were $33,878,156. Operation and maintenance expense, depreciation and taxes amounted to $29,169,955, leaving an actual net operating income for the test period of $4,708,201. After all accounting and *pro forma* adjustments, including the decrease in revenues due to abnormally cold weather, the company's return on its net investment at the end of the test period was 6.32%.

The new rate schedules proposed by the company distribute the portion of the increase attributable to the rise in the rates charged by Transco uniformly, per unit of gas, among the various classes of customers.

The current cost of the company's properties at the end of the test period was computed by the American Appraisal Company at $94,927,815. This is the trended original cost of the properties less observed depreciation, including obsolescence and inadequacy, but does not include materials and supplies or cash-working capital. The term "current cost" used in this appraisal is the cost of reproducing or acquiring the identical facilities at current prices. The current, undepreciated cost of the plant at the end of the test period was $110,516,254, or 43% higher than the original cost. The observed depreciation, so computed by the appraiser, was 14.4% of the undepreciated current cost. The accumulated depreciation reserve of the company is approximately 18% of the original cost of these properties. (There is no evidence in the record to show that either of these figures is too high or too low.) Had the appraiser used a figure for depreciation equal to the proportion that the accumulated reserve bears to the original cost, his computation of the current cost, less depreciation, would have been approximately $91,000,000.

A cost of service study was made to determine the cost of service to each of the several classes of customers. This is one factor in the proper design of rate schedules so as to spread the burden fairly among the respective classes of customers. Other factors which should be taken into account include com-

petitive conditions, consumption characteristics of the several classes and the value of the service to each class, which is indicated to some extent by the cost of alternate fuels available. The schedules proposed by Public Service are, in the opinion of the witness making this study, not unjustly discriminatory or preferential as to any class.

The embedded cost to Public Service of its present debt capital is 5.72%. Its long term debt was 63.5% of its total capital structure as of the end of the test period, its preferred stock, on which it pays dividends of 4.4% and 6%, was 13.3% thereof and the common equity is 23.2%, which is unusually low, the average gas distributing company's common equity being approximately 42% of its total capital. Its earnings in the test period covered its interest payments 1.8 times, which, in the opinion of the company's expert witness, is inadequate. On the other hand, its common stock has sold in the market above its book value, which is in contrast to the stock of a number of gas distributing companies. The bonds issued by Public Service have been sold privately and are not rated by Moody's Investment Service or by Standard & Poor.

In the opinion of the company's expert witness, the cost of common equity capital to Public Service is in the range of 15% to 17½% and the total cost of capital to the company as of the end of the test period was, in the opinion of this witness, from 8.08% to 8.59%. A return in that range on its total invested capital would cover interest charges from 2.07 times to 2.20 times and would be sufficient to attract debt capital as required. The rate increase requested by the company would, in the opinion of this witness, produce earnings near the lower limit of this range. Because of the greater risk inherent in its unusually high debt ratio, Public Service requires a higher than usual return on its equity capital.

When the temperature falls below 65 degrees, there is a close relationship between the temperature and the use of gas for heating. The term "degree day" means that the mean temperature of a day is one degree below 65 degrees. Thus, there would be 30 degree days assigned to a day on which the mean temperature is 35 degrees. The United States Weather Bureau keeps records of average degree days and publishes this information. Using these records over a 39 year period, the company witness determined the normal number of degree days per year at three weather stations in the company's service area. In the

test period, there were 22% more degree days in the Raleigh area than in a normal year, 17% more in the Charlotte area and 8½% more in the Asheville area. By a complex procedure, described in detail by the company's witness, a professional heating engineer, Public Service computed the amount of gas sold in the test period to its firm customers for heating usage above the amount which would have been sold to them for this purpose had the temperature been normal. Had the abnormally high usage of gas for heating, due to the abnormally cold weather, not occurred, such gas could have been sold by Public Service to its interruptible industrial customers at the lower rate applicable to them.

The Commission Staff called as its witnesses its Chief Staff Engineer and its Director of Accounting. Their testimony was to the following effect:

There is a direct relationship between sales of gas by Public Service to its firm customers and the degree days experienced in the area. The test period had approximately 18% more degree days than is normal. This resulted in a sale of 1,698,525 MCF to firm customers during the test period in excess of the amount which would have been sold to such customers in a year of normal weather in the heating season. This increased the company's revenues from such customers during the test period by $1,604,722 as compared with a year of normal temperatures in the heating season. Subtracting the revenues which would have been received had this gas been sold to interruptible industrial customers, the Staff Engineer computed that the appropriate adjustment because of the colder than normal weather was a deduction of $893,126 from the actual test period revenues. The Accounting Department of the Commission Staff made a *pro forma* adjustment in the company's actual test period revenues of this amount in this computation of the rate of return for the test period under the rates then in effect. (The company's accountant deducted $944,674 for this adjustment. The Commission adopted its staff's figure.)

The Staff Engineer also made a study of the cost of alternate fuels used by the company's interruptible customers when gas service to them is interrupted. Based upon this study, it was his opinion that the company's schedule of rates applicable to industrial interruptible customers is reasonable.

After all accounting and *pro forma* adjustments deemed appropriate by the Commission's Director of Accounting, includ-

ing the *pro forma* decrease of revenues by reason of abnormally cold weather, he concluded that in the test period the company had a net operating income of $4,612,397, giving it a return of 6.94% upon its net investment of $66,422,957. Allowance in full of the increases in rates sought by the company would increase the rate of return on net investment to 9.02%. With no increase in rates, Public Service would have a return sufficient to cover its fixed charges 1.76 times and would have a return on the common equity component of its capital structure of 11.667%. With the full proposed rate increases in effect throughout the test period, the company's net operating income would have been sufficient to cover its fixed charges 2.27 times and its return on the common equity component of its capital structure would have been 21.53% after all appropriate accounting and *pro forma* adjustments, including the above adjustment for cold weather.

In the opinion of the Commission's Director of Accounting, a 15% return on the common equity component of the company's capital structure might well be within the range of reasonableness. In his opinion, the higher debt ratio is favorable to the ratepayers. It is also his opinion that a 2.00 coverage of fixed charges is adequate.

*Edward B. Hipp and Maurice W. Horne for North Carolina Utilities Commission.*

*Mullen, Holland & Harrell, by J. Mack Holland, and Boyce, Mitchell, Burns & Smith by F. Kent Burns, for Public Service Company of North Carolina.*

*Claude V. Jones for City of Durham.*

*Broughton, Broughton, McConnell & Boxley, by J. Melville Broughton, Jr., for Sanford Brick & Tile Company et al.*

LAKE, Justice.

[1, 2]   The judgment of the Court of Appeals is that the order of the Utilities Commission be reversed rather than that the proceedings be remanded to the Commission for further action by it. Thus, its effect is a denial of all rate increases sought by Public Service and the dismissal of the proceedings. Since the rates in question were put into effect subject to the undertaking by Public Service to refund such portions thereof as might not be authorized by the final order, the result of the judgment of

the Court of Appeals, if affirmed by us, would be that Public Service must now refund to its customers all of the amounts collected in approximately two years by reason of these rate increases. While Public Service could institute a new proceeding before the Commission, in such new proceeding the Commission could not grant to Public Service the right to retain or to collect retroactively any part of the increases here in question. This is true for two reasons: First, to do so would be contrary to the judgment, and second, the Commission may not fix rates retroactively so as to make them collectible for past service. G.S. 62-136; *Utilities Commission v. Morgan, Attorney General,* 277 N.C. 255, 267, 177 S.E. 2d 405.

The extreme brevity of the opinion of the Court of Appeals deprives us of the benefit of the reasoning upon which its judgment is based. It would appear that the Court of Appeals was inadvertent to the fact that there were two proceedings before the Commission, not one. In the first, Public Service sought increases in rates which would yield it additional revenue in the amount of $2,904,328 per year for the purpose of increasing the company's rate of return upon its properties. In the second, Public Service sought rate increases for the purpose not of increasing the company's return upon its properties but of recovering the additional cost to it of gas purchased from its supplier so as to avoid a reduction in such return.

The evidence is ample to show that Transco increased its rates to Public Service. The Commission found the net effect of the changes by Transco in its rates to Public Service was to increase the cost of gas to Public Service by $1,652,003 per year. There is no evidence in the record and no contention by the protestants to the contrary. It follows, necessarily, that if Public Service is not allowed to increase its own rates so as to pass this additional cost on to its customers, the return of Public Service upon its properties will be decreased by $1,652,003 per year, unless there is some offsetting reduction in its other expenses or some other offsetting increase in its revenues, neither of which is suggested in the record. Such a reduction in the return to Public Service upon its properties could be justified only by a finding by the Commission, supported by substantial evidence in the record, that the return earned by Public Service upon its properties, prior to the increases in the rates charged by Transco, was excessive and unreasonable. There has been no such finding by the Commission and we have found

no evidence in the record which would have sustained such a finding.

The effect of the judgment of the Court of Appeals, if affirmed by this Court, would be to require Public Service to make a refund of more than $3,000,000 collected by it for the sole purpose of offsetting its additional operating costs due to the increases in the rates of Transco. We are confident that the Court of Appeals was inadvertent to this consequence of its judgment. The Court of Appeals sustained the protestants' Assignments of Error 1, 2 and 5. Nothing in these suggests that, had the increases in rates charged by Transco not occurred, the earnings of Public Service during the test period were excessive, so as to justify a reduction in its rates. Neither of the two dissenting commissioners disagreed with the majority of the Commission with respect to so much of the order as permitted Public Service to increase its rates to the extent necessary to offset the increase in the cost of gas to it.

[3] Neither this Court nor the Court of Appeals is authorized to fix rates for a public utility. That is the function of the Utilities Commission. Neither this Court nor the Court of Appeals is authorized to substitute its judgment for that of the Commission or to reverse an order of the Commission setting rates except for one of the causes specified in G.S. 62-94(b). None of those grounds for reversal of the Commission's order, insofar as it relates to rate increases designed only to offset the increased cost of gas to Public Service, appears in this record. To that extent, therefore, the judgment of the Court of Appeals is in excess of the statutory power of the court and must be vacated.

We turn now to the second aspect of the order of the Commission, which relates to the increases in the rates allowed for the purpose of enabling Public Service to receive a greater return upon its properties. For this purpose the Commission allowed increases in rates designed to yield additional revenues totaling $1,445,168 per year. To this portion of the order, Commissioners Wells and McDevitt dissented, and to it the protestants' assignments of error, sustained by the Court of Appeals, relate.

G.S. 62-133(b) prescribes five steps to be taken by the Commission in a proceeding to fix rates for such purpose. These are: (1) Ascertain the fair value of the public utility's prop-

erty used and useful in providing the service; (2) estimate the utility's revenue under the present and proposed rates; (3) ascertain the utility's reasonable operating expenses, including depreciation; (4) fix a fair rate of return on the fair value of such properties; and (5) fix the rates to be charged by the public utility which will enable it, in addition to paying such operating expenses, to earn such rate of return on the fair value of such properties.

Paragraph (d) of this statute further requires the Commission to consider "all other material facts of record that will enable it to determine what are reasonable and just rates."

[4] For the purpose of making the required estimates of the public utility's revenues and operating expenses, the customary and a proper procedure is for the Commission to fix a test period of twelve months, ending, as close as practicable, before the opening of the hearing. As we said in *Utilities Commission v. Morgan, Attorney General*, 278 N.C. 235, 236-7, 179 S.E. 2d 419:

> "The basic, underlying theory of using the company's operating experience in a test period, recently ended, in fixing rates to be charged by it for its service in the near future is this: Rates for service, in effect throughout the test period, will, in the near future, produce the same rate of return on the company's property, used in rendering such service, as was produced by them on such property in the test period, adjusted for known changes in conditions."

The actual experience of the company during the test period, both as to revenues produced by the previously established rates and as to operating expenses, is the basis for a reasonably accurate estimate of what may be anticipated in the near future if, but only if, appropriate *pro forma* adjustments are made for abnormalities which existed in the test period and for changes in conditions occurring during the test period and, therefore, not in operation throughout its entirety.

In the present record, the evidence is clear, abundant and uncontradicted that: (1) The weather during the heating season in the test period was abnormally cold; (2) with or without such cold weather, Public Service would have sold all the gas available to it from Transco and, therefore, the weather conditions did not affect the volume of gas purchased by it or the

---

---

cost to it of such gas; (3) by reason of such cold weather, a greater than usual portion of its gas was sold by Public Service to its firm customers for heating purposes and a correspondingly smaller portion was sold by it to its interruptable industrial customers; (4) the rates charged by Public Service to firm customers are higher, per unit of gas, than the rates charged by it to interruptible industrial customers; and (5) as a result, during the test period, Public Service received more revenues than it would have received from the sale of the same volume of gas in a test period of normal weather.

Therefore, to use the actual experience of the company in the test period as a basis for estimating the probable revenues it will earn in the future under the same rates for service would result in an overestimate of such future revenues and be unfair to the company. Conversely, in a test period in which the weather during the heating season was abnormally warm, so that a smaller than customary volume of gas was used for heating purposes at the higher rates for firm service and a larger than customary volume of gas was sold to interruptible industrial users at the lower rates applicable to that service, would show less revenues than should reasonably be anticipated in the future. In the latter event, to fail to adjust the test period revenues upward would lead to higher rates for service than necessary to yield the return to the company contemplated by G.S. 62-133(b) and would be unjust to the users of gas.

[5] Of course, weather conditions fluctuate and there is no way in which the Commission, engaged in fixing rates, can determine whether the weather in future twelve month periods will be colder or warmer than that of the test period, or colder or warmer than the average in past years. Rate making is, of necessity, a matter of estimate and prediction since rates are set for the future. The statute does not require the Commission to make an adjustment for a slight variation between the weather of the test period and the weather of an average year. The maxim, *de minimis non curat lex,* is applicable to what might be called normal variations from the average. Where, however, as in the present record, the evidence is clear and undisputed that the heating season of the test period was abnormally cold (or abnormally warm), the Commission is clearly authorized, if not required, by G.S. 62-133(b)(2) to make a reasonably appropriate adjustment for such abnormality in the test period experience.

[6] In the present instance, expert witnesses, both for the company and for the Commission Staff, testified to the substantial abnormality of the temperature in the heating season of the test period. They were in substantial agreement. The protestants offered no evidence relating to this matter and elicited by cross-examination no information disclosing error in the studies of these witnesses. The formulae used by these witnesses for computing the amount of adjustment in revenues to be made by reason of the abnormally cold weather appear to us unnecessarily complex. It would seem that a relatively simple and reasonably accurate computation could be made by determining from the company's records the number of days, or hours, in which service to the interruptible customers was interrupted and the volume of gas thus diverted to heating customers. Nothing in the record, however, indicates or suggests that the more complex formulae used by these witnesses resulted in a materially inaccurate computation of the gas so diverted and sold at the higher rate. The Commission elected to accept and use the determination of the amount of such diversion computed by its Staff Engineer. The credibility of testimony and the weight to be given it are for the Commission, not for the reviewing court, and its findings of fact, supported by competent, material and substantial evidence, are conclusive upon appeal. *Utilities Commission v. Telephone Co.*, 281 N.C. 318, 336, 189 S.E. 2d 705; *Utilities Commission v. Coach Co.*, 269 N.C. 717, 153 S.E. 2d 461; *Utilities Commission v. Telegraph Co.*, 267 N.C. 257, 148 S.E. 2d 100; *Utilities Commission v. Coach Co.*, 261 N.C. 384, 134 S.E. 2d 689; *Utilities Commission v. Champion Papers, Inc.*, 259 N.C. 449, 130 S.E. 2d 890; *Utilities Commission v. Towing Corp.*, 251 N.C. 105, 110 S.E. 2d 886.

The Commission's Finding of Fact No. 13, set forth above, is supported by substantial, competent evidence in the record and the Court of Appeals erred in sustaining the protestants' Assignment of Error No. 5, which is directed thereto.

As above noted, G.S. 62-133 (b) (1) requires the Commission, as the first step in fixing rates to be charged by a public utility, to ascertain the fair value of the properties used and useful in providing the service. The statute prescribes that, in the ascertainment of such fair value, the Commission shall consider the reasonable original cost, less depreciation, the replacement cost of the property and all other relevant factors. It further provides that the Commission may determine the replace-

ment cost by trending original cost to current cost levels or by any other reasonable method.

In the present case, the Commission had before it evidence of the original cost of the properties, the accumulated reserve for depreciation, the result of trending original cost to current cost levels, the observed depreciation, including obsolescence and inadequacy, and the deduction to be made from current cost on account of depreciation if it be assumed that the actual depreciation has occurred at the same rate as that at which the reserve for depreciation has been accumulated, this being a somewhat larger amount than the observed depreciation according to the testimony of the company's expert witness. There is in the record no substantial conflict in the testimony concerning any of these items. The protestants offered no evidence as to any of them and the cross-examination of the witnesses who testified thereto did not disclose any errors in their computations. The credibility of such testimony and the weight to be given to it are for the Commission. *Utilities Commission v. Telephone Co., supra,* at pp. 339, 358. It, not the reviewing court, is to make the determination of the fair value of the properties. Its determination, if supported by substantial evidence in the record, is conclusive on appeal. G.S. 62-94(b); *Utilities Commission v. Telephone Co., supra,* at pp. 336, 339.

The Commission found the fair value of the properties to be $79,272,908. The protestants' Assignment of Error No. 1, sustained by the Court of Appeals, is directed to this finding, it being the contention of the protestants that the Commission arbitrarily and capriciously added 20% to the net investment of the company in the properties.

The Commission did not make an express finding of the original cost of the properties, less depreciation. It did, however, in its Finding No. 6, find that the company's net operating income for return, appropriately adjusted, was $4,828,260 and that this resulted in a rate of return on net investment, i.e., original cost less depreciation, of 7.27%. A simple arithmetic computation shows that the Commission thus found the original cost of the properties, less depreciation, as of the end of the test period, was $66,413,480. This amount lies between two computations of net investment appearing in the testimony of the Commission's Staff Accountant and is somewhat less than the lowest figure for net investment in the testimony of the company's witnesses. Thus, the Commission's finding of net investment

(original cost less depreciation, plus the allowance for working-capital) is supported by substantial evidence and, if somewhat on the low side, is not prejudicial to the protestants.

[7]   In its Finding of Fact No. 5, the Commission expressly found the fair value of the properties (including the allowance for working-capital) to be $79,272,908. Again, a simple arithmetic calculation discloses that the fair value thus found is slightly more than 19% above the original cost so found. It is a mathematical truism that there is a percentage relationship between any two numbers. Such relationship between the figure found as the fair value and the figure found as the original cost of the properties does not, per se, support the protestants' charge that the Commission arrived at its figure for fair value by arbitrarily adding to its figure for original cost a certain percentage thereof. We find nothing else in the record to support such charge.

The only evidence in the record concerning the replacement cost of the properties was the testimony and exhibits of the company's witness, Mr. Russell, who computed the replacement cost by trending the original cost to current cost levels and subtracting from the figure so computed his estimate of actual, observed depreciation, including obsolescence and inadequacy. His testimony was that, so computed, the replacement cost, depreciated, was $94,626,596 and that, had he subtracted for depreciation a percentage of the trended original cost equivalent to the ratio of the accumulated reserve for depreciation to original cost, the resulting figure for replacement cost would have been approximately $91,000,000. Thus, the amount found by the Commission to be the fair value of the properties was approximately midway between the net original cost, less depreciation, and Mr. Russell's lower figure for replacement cost, less depreciation, being slightly nearer the latter figure. We find in this no indication that the Commission, in reaching its conclusion as to the fair value of the properties, failed to observe the mandate of G.S. 62-133(b)(1) that it take into consideration the original cost less depreciation, the replacement cost and other relevant factors disclosed in the record.

In *Utilities Commission v. Telephone Co. supra,* at p. 358, we said: "Quite obviously, 'replacement cost' and 'fair value' are not synonymous. It is equally clear that 'fair value' is not an arithmetical average of original cost and replacement cost, less depreciation, nor is it to be 'ascertained' by the application

of any mathematical formula." As Chief Justice Denny, speaking for this Court, observed in *Utilities Commission v. Telephone Co.*, 266 N.C. 450, 146 S.E. 2d 487, "Ordinarily, the fair value of a utility's property is found to be less than the reconstruction cost of the property." Clearly, G.S. 62-133 (b) (1) contemplates that normally the Commission will so find.

[8] Here, as in *Utilities Commission v. Telephone Co.*, 281 N.C. 318, 189 S.E. 2d 705, the Commission failed to set forth its finding of replacement cost, depreciated. As we there said, this was error. In fairness to the Commission, we note that its order in the present case was entered prior to our decision in that case. As we there said, at p. 360, having made findings of the original cost less depreciation, and replacement cost less depreciation, the weight to be given those figures in reaching the ultimate finding of fair value is to be determined by the Commission, not by the reviewing court.

The protestants have not shown wherein they have been prejudiced by this technical error of the Commission. We, therefore, do not deem this error by the Commission sufficient ground for the sustaining of the protestants' Assignment of Error No. 1 and the reversal of the order. G.S. 62-94 (c) provides that, upon an appeal from an order of the Commission, "due account shall be taken of the rule of prejudicial error." Paragraph (b) of this section of the statute further provides that the reviewing court may reverse or modify the decision of the Commission "if the substantial rights of the appellants have been prejudiced" because the Commission's findings, inferences, conclusions or decisions are affected by errors of law. We conclude, therefore, that the Court of Appeals erred in sustaining the protestants' Assignment of Error No. 1 and in basing its reversal of the order thereon.

[9] The protestants' Assignment of Error No. 2, also sustained by the Court of Appeals, relates to the Commission's finding that the rate of return earned by Public Service in the test period on the company's net investment in its properties was 7.27% and insufficient. Insofar as this assignment of error relates to the Commission's finding as to what rate of return was earned, its basis appears to be the Commission's determination that a *pro forma* adjustment in test period revenues should be made on account of abnormally cold weather. As hereinabove stated, we find no error in this. Insofar as this assignment of error relates to the sufficiency of the rate of return so found, the testi-

---

mony of the company's expert witness supports the finding of the Commission and the testimony of the Commission's Staff Accountant is not in substantial conflict therewith. The protestants offered no evidence relating to the question of what rate of return would be fair.

G.S. 62-133 (b) (4) requires the Commission to fix such rate of return on the fair value of the properties as will enable the company by sound management to produce a "fair profit for its stockholders," to maintain its facilities and services and to compete in the market for capital funds on reasonable terms, fair to its customers and to its existing investors. Here, too, the finding of the Commission, if supported by substantial evidence, is conclusive upon appeal, even though the reviewing court might deem a lower rate of return adequate. We find in the record no basis for the sustaining of this assignment of error.

We, therefore, conclude that the Court of Appeals erred in reversing the order of the Commission, that its judgment must, therefore, be reversed and the matter remanded to it for the entry by it of a judgment overruling each of the protestants' assignments of error and affirming the order of the Commission.

Reversed and remanded.