STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION; NORTH CAROLINA NATURAL GAS CORPORATION, APPLICANT; AND ALUMINUM COMPANY OF AMERICA, INTERVENOR v. FARMERS CHEMICAL ASSOCIATION, INC., PETITIONER.

No. 7810UC366

(Filed 21 August 1979)

1. Gas § 1— surcharge on natural gas—method for determining amount—propriety

In determining the amount of an emergency surcharge to which a natural gas supplier was entitled, the Utilities Commission did not err in adopting a price method somewhere between rolled-in pricing and incremental pricing that appeared to be fair and equitable to the parties.

2. Gas § 1; Utilities Commission § 21— surcharge on natural gas—recovery for past use improper

　　The Utilities Commission exceeded its statutory authority in requiring a fertilizer manufacturer to pay a surcharge for emergency natural gas used by the manufacturer prior to the date that the tariff including the surcharge became effective, though the supplier did not bill the manufacturer for such gas until after the tariff became effective.

　　Judge MARTIN (Robert M.) concurs in the result.

APPEAL by petitioner from order of the North Carolina Utilities Commission entered 14 February 1978 in Docket No. G-21, Sub 148. Heard in the Court of Appeals 31 January 1979.

Farmers Chemical Association (hereinafter referred to as FCA) operates a plant in Hertford County to manufacture nitrogen fertilizer. The plant uses natural gas for feedstock purposes (as a raw material to be converted into fertilizer) and as a fuel to effectuate the conversion. FCA has a long-term contract for gas supply with North Carolina Natural Gas Corporation (hereinafter referred to as NCNG). It is NCNG's largest customer and under normal circumstances, uses 29,200 Mcf per day, for which it pays NCNG nearly one million dollars per month. For safety and efficiency reasons, the plant must either generate at virtually full capacity or shut down entirely. Anticipating a gas shortage during the 1975-76 winter season (from 16 November 1975 through 15 April 1976), the Utilities Commission established priorities for allocation of NCNG's gas: residential customers were awarded first priority; commercial and industrial customers (of which FCA had one of the highest priorities) were awarded second priority; and certain other users were given third-level priorities.

In October 1975, Transcontinental Gas Pipeline (hereinafter referred to as Transco), NCNG's sole supplier of gas, predicted a shortage so severe that FCA could expect to receive only forty-five percent (45%) of its normal requirements for the 1975-76 winter season. NCNG and FCA officials met on 6 November 1975, and it was agreed that FCA would use its forty-five percent (45%) entitlement of gas as follows: (1) operate at full capacity from 16 November 1975 through 3 January 1976, thereafter, close for three weeks, and (2) reopen and operate at full capacity until 12 February 1976. Some adjustments to this schedule were anticipated if the shortage was not as predicted; however, FCA

made it clear at this meeting that it would rather close down than use emergency gas, which might become available from suppliers other than Transco at higher prices.

Transco's shortage was not as severe as predicted, and it was able to make three restorations of service to NCNG, which were announced as follows: on 13 November 1975, an increase of 1,019,000 Mcf of gas; on 10 December 1975, an increase of 608,000 Mcf of gas; and on 15 January 1976, an increase of 1,494,000 Mcf of gas. Additionally, NCNG purchased 1,441,362 Mcf of emergency gas from Michigan Consolidated Gas (hereinafter referred to as Michigan). Delivery of this gas began on or about 1 December 1975.

The emergency gas cost more, and by letter dated 8 December 1975, FCA advised NCNG that it did not want any of the emergency gas. The increases in NCNG's gas supply were such that FCA never had to close down, and its plant operated throughout the 1975-76 winter season. NCNG's other commercial and industrial customers suffered some shortages early in the season. Its residential customers suffered no shortages and would not have done so even if the emergency gas had not been purchased.

On 22 December 1975, NCNG applied to the Utilities Commission for recovery of the $1,544,211, the cost of the emergency gas from Michigan. No hearing was held. On 6 January 1976, the Commission ruled that NCNG could recover the cost by a surcharge of 18.5 cents per Mcf on all gas other than that used by residential customers. NCNG filed such tariffs on 7 January 1976 and then billed FCA for December gas including the surcharge. FCA's billings for subsequent months also included the surcharge. On 2 February 1976, FCA asked the Commission to review its 6 January 1976 surcharge ruling, asking that the emergency gas be priced on either an incremental basis (under which the entire cost of the emergency gas is charged to those customers who would not have been served without it) or on a rolled-in basis (under which the cost is averaged out and shared by all customers). A hearing was held and evidence presented. The Commission entered an order on 3 June 1976 affirming its 6 January 1976 ruling.

*Inter alia,* the Commission concluded that residential customers had not benefited from the purchase of emergency gas, but that FCA and all other industrial and commercial customers had benefited from the purchase and should pay for it. FCA appealed, and this Court reversed the 3 June 1976 order of the Commission and remanded the case for a new order. The first case is reported in 33 N.C. App. 433, 235 S.E. 2d 398, *dis. rev. denied,* 293 N.C. 258, 237 S.E. 2d 539 (1977).

*Sanford, Cannon, Adams & McCullough, by H. Hugh Stevens, Jr., William H. McCullough, and Charles C. Meeker, for petitioner appellant.*

*Public Staff North Carolina Utilities Commission, by Chief Counsel Jerry B. Fruitt and Robert F. Page, for North Carolina Utilities Commission, appellee.*

*McCoy, Weaver, Wiggins, Cleveland & Raper, by Donald W. McCoy, for North Carolina Natural Gas Corporation, intervenor-appellee.*

*Joyner & Howison, by Henry S. Manning, Jr., for Aluminum Company of America, intervenor-appellee.*

ERWIN, Judge.

This Court remanded this case on its first appeal with the following instructions:

"In addition to those already discussed, the Commission made no findings and conclusions on the following important issues in the case:

1. Whether on November 6, 1975 Farmers Chemical and NCNG agreed that appellant would accept its fifty-five percent (55%) winter curtailment by operating at full capacity until January 3, 1976, and then closing down completely for various periods thereafter;

2. Whether the three Transco restorations permitted Farmers Chemical to operate at one hundred percent (100%) capacity throughout the 1975-76 winter without resorting to the use of any emergency gas;

3. Whether Transco Interim Settlement established prices for emergency gas volumes incrementally and treated such gas as being injected last into the pipeline system for the period covered by such settlement;

4. Whether Farmers Chemical put NCNG on notice in November and December, 1975 that it did not want any emergency gas; and

5. Whether residential customers should be excluded from paying their share of the emergency surcharge.

.   .   .

Such findings and conclusions are necessary to enable this Court to determine whether the Commission had performed the duty imposed by statute. The matter is remanded to the Commission to make necessary findings and conclusions on which it may base its order."

*See Utilities Comm. v. Farmers Chemical Assoc.*, 33 N.C. App. 433, 446, 235 S.E. 2d 398, 405, *dis. rev. denied*, 293 N.C. 258, 237 S.E. 2d 539 (1977).

The Commission's findings and conclusions, if supported by competent, material, and substantial evidence, are conclusive on the appeal before us. *See Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 189 S.E. 2d 705 (1972), and *Utilities Commission v. Coach Co.*, 269 N.C. 717, 153 S.E. 2d 461 (1967).

The Commission found in the case *sub judice* that FCA directly benefited from the purchase of emergency gas in the amount of 273,073 Mcf which is supported by Nery's Exhibit No. 3. The Commission acknowledges that the figures shown on the exhibit are projections rather than actual usages. Projections are permitted to be used in some events over the actual experiences of the companies involved. *See Utilities Comm. v. City of Durham*, 282 N.C. 308, 193 S.E. 2d 95 (1972).

[1] Over objections of petitioner, the Commission adopted a price method somewhere between rolled-in pricing and incremental pricing that appears to be fair and equitable to the parties. We cannot conclude as a matter of law that the Commission

committed error in its method of reaching the price of the gas used in this event. The law imposes a duty on the Commission, and not the courts, to fix rates. *Utilities Commission v. Telephone Co.*, 266 N.C. 450, 146 S.E. 2d 487 (1966). We do not find the acts of the Commission to be unreasonable, but rather a legitimate use of its statutory authority. This assignment of error is without merit.

The second question presented by petitioner is: Did the Commission err in failing to make proper findings and conclusions about the 6 November 1975 agreement between NCNG and Farmers Chemical? The Commission made the following finding in response to our remand order:

"16. On November 6, 1975, representatives of NCNG and FCA met, pursuant to the Commission's directive (Decretal paragraph No. 4, Docket No. G-100, Sub 24), to discuss FCA's requirements for the winter season and how such requirements might be met. FCA was informed that it could be served 2,003,876 Mcf, or 45% of requirements. On the basis of 29,200 Mcf per day, this supply could serve FCA at 100% for 68.6 days of the 152-day winter period. It was agreed that FCA would be allowed to oprate 100% from November 16, 1975, through January 3, 1976. If consumption averaged less than 29,200 Mcf per day, FCA would be served the unused portion for up to three days or through January 6, 1976. The Tunis plant would then shut down for three weeks and reopen and run until February 12 or the balance of the winter depending upon the availability of gas. It was understood that, if Transco made restorations to its gas supply and NCNG had not experienced an abnormally cold winter, FCA would be given further service depending on NCNG's flexibility. The meeting of November 6, 1975, primarily concerned days of service during the winter season. The discussion of purchase of emergency gas occurred near the end of the meeting. (FCA witness Lawrence; No. 7610UC825, R pp 63-64, 66.)

17. At the November 6, 1975 meeting, FCA's response to NCNG's question concerning the purchase of emergency gas referred to a direct purchase for FCA at incremental pricing to supplement its 45% supply of flowing gas, not to emergen-

cy gas purchased for the system with costs borne by other customers as well. (FCA witness Borst, No. 7610UC825, R p 18, '. . . closing the plant if what we had to operate on was high priced INTRASTATE gas,' (emphasis added), R p 20, 'FCA contends . . . emergency gas . . . should be . . . rolled-in'; R p 24, '. . . gas should be priced on a rolled-in basis'; R p 27, 'The incremental cost of that emergency gas is so high that it would not be economical . . . The incremental price . . . is something on the order of a dollar ninety-seven. That's an extremely high cost'; R p 27, 'If . . . we knew that our only source of gas was emergency gas at . . . $1.97 per Mcf, we would have shut down.'

(EXCEPTION #8)"

We hold the above findings (Nos. 16 and 17) are sufficient and supported by the record before us. The credibility of the evidence and the weight to be given to it are for the determination of the Commission. *Utilities Comm. v. Telephone Co.*, 285 N.C. 671, 208 S.E. 2d 681 (1974), and *Utilities Comm. v. Power Co.*, 285 N.C. 398, 206 S.E. 2d 283 (1974). We find no merit in this assignment of error.

Petitioner's next assignment of error reads: Did the Commission err in failing to make proper findings and conclusions concerning whether residential customers should be excluded from the emergency surcharge?

The Commission found:

"27. Residential customers (Priority R. 1) were never expected to be even partially curtailed, even if the winter had been abnormally cold, and therefore could not have benefited from the emergency gas purchase. (See Appendix A, Case 1; Compare R. 1 requirements of 4,726,853 Mcf with known total supplies of 10,130,260 Mcf.)          (EXCEPTION No. 13)"

The whole record and the evidence therein support Finding of Fact No. 27. We are mindful that whether the Commission's findings are supported by competent, material, and substantial evidence is a question of law and is reviewable. Our review of the record compels us to overrule this assignment of error.

Petitioner assigns the following question as error: Did the Commission err by making findings and conclusions that were irrelevant, improper, and prejudicial to Farmers Chemical? Petitioner takes issue with the following eleven findings of fact, to wit:

1. "The incremental or additional cost of emergency gas was $1.03 per Mcf (NCNG witness Wells, No. 7610UC825, R p 77 $1.89613 divided by 0.96 for Transco's line retention of 4%, minus $0.945)."

2. "The additional cost of serving FCA with direct-purchased emergency gas to supplement its 45% supply would have been $2,514,354 (0.55 times 4,438,400 Mcf times $1.03 per Mcf).                    (EXCEPTION No. 9)"

3. "By telegram of December 1, 1975, NCNG notified Farmers Chemical of its intent to make an emergency purchase of natural gas supply and indicated the approximate amount of the surcharge on all nonresidential gas sales during the winter period as $.22 per Mcf. FCA's new winter period share of NCNG's gas supply was 3,626,173 Mcf, including 741,213 Mcf of emergency gas (No. 7610UC825, R p 69; 3,626,173 less 2,884,960, which was FCA's share after Transco's first restoration on November 13, 1975.                    (EXCEPTION No. 10)"

4. "Had FCA paid the estimated surcharge on its projected winter season volumes of 3,626,173 Mcf (as of December 1, 1975), the additional cost would have been $797,758,173 (3,626,173 times $0.22 per Mcf.)          (EXCEPTION No. 11)"

5. "Had FCA been charged incrementally for its share of the purchased emergency gas, the additional cost would have been $763,449 (741,213 times $1.03 per Mcf) plus gross receipts tax.                    (EXCEPTION No. 12)"

6. "FCA directly benefited from the purchase of emergency gas in the amount of 243,073 Mcf (4,438,400 Mcf minus 4,195,327 Mcf). (See Appendix A, Case IV; Supplemental Brief of FCA, filed December 16, 1977, p. 1.)
                    (EXCEPTION No. 16)"

7. "Under FCA's proposal in this docket, namely, fully rolled-in pricing at an estimated surcharge of 11.81 ± per Mcf (NCNG witness Wells; No. 7610UC825, R pp 73-74), the total surcharge to FCA would have been $523,731 (4,438,400 Mcf times 11.8 ± per Mcf.) (EXCEPTION No. 17)"

8. "The difference between what FCA paid under the emergency purchase surcharge and what it has been willing to pay is $57,099.                    (EXCEPTION No. 18)"

9. "FCA's total base billing for the 1975-1976 winter season was approximately $6,058,416 (4,438,400 Mcf times $1.365 per Mcf).                    (EXCEPTION No. 19)"

10. "FCA's surcharge costs for emergency gas which enabled it to operate at 100% of requirements for the entire season amounts to 9.6% of its total base billing for the period ($580,830 divided by $6,058,416).
                                        (EXCEPTION No. 20)"

11. "The difference between what FCA paid and what FCA was willing to pay amounts to 0.94% of FCA's total base winter season billing ($57,099 divided by $6,058,416).
                                        (EXCEPTION No. 21)"

We note that petitioner does not call our attention to any authority to support its contentions on this assignment of error. On the whole record before us, we find no error in any of these findings of fact. The record supports each of them.

[2]   The last assignment of error reads: Did the Commission err by authorizing a retroactive rate increase?

Petitioner contends:

"The January 7, 1976 tariff, as filed by NCNG, gave the following effective date. 'Effective: Billings on and after January 7, 1976.' (76 R p 8) Since NCNG did not bill Farmers Chemical for December, 1975 gas until January 8, 1976, NCNG added the 18.5¢ per Mcf emergency surcharge to the charges for all gas used by Farmers Chemical in December, 1975. Indeed, NCNG withheld Farmers Chemical's December bill until January 8, 1976, apparently in expectation of the Commission's letter order of January 6. (76 R pp 67, 26, 18)

The emergency surcharge also was applied to volumes used by Farmers Chemical in the January 1-6, 1976 period."

Petitioner argues that NCNG delayed its December 1975 billing until after the filing of its new tariff, that it then billed for December 1975 and 1-6 January 1976 services according to the new tariff, and that this amounts to a retroactive rate increase which is illegal under G.S. 62-139(a).

G.S. 62-139(a) provides:

"(a) No public utility shall directly or *indirectly, by any device whatsoever, charge, demand, collect or receive from any person a greater or less compensation for any service rendered or to be rendered by such public utility than that prescribed in the schedules of such public utility applicable thereto then filed in the manner provided in this Article*, nor shall any person receive or accept any service from a public utility for a compensation greater or less than that prescribed in such schedules." (Emphasis added.)

In *Utilities Comm. v. Edmisten, Atty. General*, 291 N.C. 451, 468, 232 S.E. 2d 184, 194 (1977), Justice Lake stated the following for the Supreme Court:

"The Attorney General argues that such a surcharge would be retroactive rate making, which, as all of the parties agree, would be improper. *Utilities Commission v. City of Durham*, 282 N.C. 308, 318, 193 S.E. 2d 95 (1972); *Utilities Commission v. Morgan*, 277 N.C. 255, 267, 177 S.E. 2d 405 (1970). We agree with the argument of the companies, and of the Commission, that this contention of the Attorney General is not technically correct. Technically, retroactive rate making occurs when an additional charge is made for past use of utility service, or the utility is required to refund revenues collected, pursuant to then lawfully established rates, for such past use."

A rate is fixed or allowed when it becomes effective pursuant to G.S. 62-130(a), and rates must be fixed prospectively from their effective date. G.S. 62-136(a) provides that the Commission shall determine rates "to be thereafter observed and in force." The Commission may not fix rates retroactively so as to make them collectible for past services. *Utilities Comm. v. City of Durham*,

282 N.C. 308, 193 S.E. 2d 95 (1972). G.S. 62-139(a) does not distinguish between permanent rates, temporary rates, or surcharges.

We hold that the Commission exceeded its statutory authority by billing petitioner with a surcharge for emergency gas prior to 7 January 1976. For that reason, the order of the Commission is remanded to conform with the opinion of this Court. All other exceptions of petitioner are overruled. We note the Commission and the parties were faced with a very difficult problem in December 1975 and proceeded in good faith to work out their destinies without benefit of past experiences of any magnitude.

That portion of the Commission's order relating to billing petitioner with a surcharge from December 1975 to 6 January 1976 is vacated and remanded for a proper order.

Vacated in part and remanded.

Affirmed in part.

Judge MITCHELL concurs.

Judge MARTIN (Robert M.) concurs in the result.