State ex rel. Utilities Comm. v. N. C. Textile Manufacturers Assoc., Inc.

*ant would be actually prejudiced by an amendment and a continuance of the case, or plaintiff's proof is lacking in some detail, and the court is unwilling to grant a continuance but does feel that he should have an opportunity of commencing another action.* Since a dismissal with prejudice is a harsh sanction, such a dismissal is warranted only in extreme circumstances, and only after the trial court has considered a wide range of lesser sanctions. (Emphasis added.)

5 Moore, Moore's Federal Practice, § 41.14.

In summary, we hold that the trial court's dismissal without prejudice of the defendant's appellate counsel fees motion was not an adjudication upon the merits of that claim and that the trial court acted within its discretion under Rule 41(b) in deciding that the defendant should have the opportunity to file another motion for counsel fees under N.C.G.S. § 50-16.4. Accordingly, the decision of the Court of Appeals is reversed insofar as it modified the judgment of the trial court as to the appellate counsel fees.

Reversed.

Justice VAUGHN did not participate in the consideration or decision of this case.

———————

STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION AND NORTH CAROLINA NATURAL GAS CORPORATION v. NORTH CAROLINA TEXTILE MANUFACTURERS ASSOCIATION, INC. AND THE CITIES OF WILSON, ROCKY MOUNT, MONROE AND GREENVILLE, NORTH CAROLINA

No. 269A84

(Filed 2 April 1985)

1. Gas § 1— natural gas ratemaking—elimination of Curtailment Tracking Rate— findings and conclusions inadequate

   The Utilities Commission's findings and conclusions were inadequate as a matter of law to support its conclusion that a rate increase of $1,117,531 was just and reasonable where the Commission allowed an increase of $1,117,531 plus the elimination of the Curtailment Tracking Rate, which would result in another increase of approximately $3,300,000 for a total increase of $4,417,531. The Curtailment Tracking Rate was established as part of the basic rate struc-

State ex rel. Utilities Comm. v. N. C. Textile Manufacturers Assoc., Inc.

ture, and the reasonableness of the increase in consumer cost due to the elimination of the CTR is a material issue of fact that must be dealt with by the Commission in its findings and conclusions. G.S. 62-79(a) (1982).

**2. Gas § 1.1— natural gas ratemaking—discrimination between classes of customers—not addressed—error**

In a natural gas ratemaking case, the Utilities Commission erred by not addressing the question of unreasonable discrimination among and within the classes of service where the evidence before the Commission made it clear that there was substantial discrimination between the various classes of customers. G.S. 62-94(b); G.S. 62-140(a).

**3. Gas § 1— natural gas ratemaking—wholesale service—subsidized rates—no evidence to support findings**

In a natural gas ratemaking case where the cities to whom wholesale service was provided proposed a plan whereby residential, small industrial, and some commercial customers would share the benefit of subsidized rates with wholesale customers, the Commission erred by finding that the plan was administratively unfeasible. No evidence that the plan would be difficult to administer was put before the Commission. G.S. 62-94(b) (1982).

**4. Gas § 1— natural gas ratemaking—Transportation Rate**

In a natural gas ratemaking case, the Transportation Rate was to be included on remand in the determination of whether presently charged rates were discriminatory; however, the appellant did not indicate that it argued before the Commission that the Transportation Rate is unjust as a matter of law or that the Commission failed to make adequate findings on this question and the Commission need not consider it on remand.

**5. Utilities Commission § 3— challenges to rates—anti-trust not available**

Challenges to rates are limited by the legal theories provided by the Public Utilities Act; the rates of public utilities under the jurisdiction of the Utilities Commission are not subject to attack on the basis that they violate the anti-trust laws.

**6. Gas § 1— natural gas regulation—Industrial Sales Tracker—new customers excluded—error**

The Utilities Commission erred by excluding new customers from the calculation of the Industrial Sales Tracker, which enables the North Carolina Natural Gas Corporation to negotiate lower prices when necessary for those customers capable of switching to fuel oil while recovering lost profit margins through surcharges to other customers, with any surplus at year end to be refunded. The Commission did not adequately summarize the arguments; moreover, excluding new industrial and large commercial customers from the operation of the IST is unjust and unreasonably discriminatory as a matter of law because the North Carolina Natural Gas Corporation has the chance to earn large profits from new customers while protecting itself from losses at the expense of a select portion of its ratepayers. G.S. 62-140(a).

7. **Utilities Commission § 32— natural gas pipeline used for storage—used and useful**

The Utilities Commission's inclusion in the rate base of a natural gas pipeline that had been built to serve a large industrial customer that had ceased operations was supported by evidence that the line was used and useful by virtue of its use as a storage facility.

APPEAL by the Cities of Wilson, Rocky Mount, Monroe and Greenville, North Carolina and the North Carolina Textile Manufacturers Association, Inc. pursuant to N.C.G.S. § 7A-29(b) from the final order of the North Carolina Utilities Commission entered 6 January 1984 in Docket Nos. G-21, Sub 235 and Sub 237. Heard in the Supreme Court 4 February 1985.

On 27 April 1983 North Carolina Natural Gas Corporation (NCNG) filed an application with the North Carolina Utilities Commission (Commission) pursuant to N.C.G.S. § 62-133 for authority to adjust its rates and charges for natural gas. Except for small amounts of gas received from an exploration and development subsidiary, NCNG's natural gas distribution system receives all of its gas requirements from Transcontinental Gas Pipeline Corporation (Transco). NCNG is engaged in furnishing retail natural gas service in eastern North Carolina to residential, commercial and industrial customers. The company also provides wholesale service to the Cities of Wilson, Rocky Mount and Monroe, North Carolina and the Greenville Utilities Commission of Greenville, North Carolina (Cities). The Cities are authorized under N.C.G.S. §§ 160A-311(4) and 160A-312 to own and operate their own natural gas distribution systems. Rates set by the Cities for retail customers are not subject to regulation by the Commission.

NCNG uses a number of rate schedules in its business. Those pertinent to this case are: Rate Schedule No. 1—Residential; Rate Schedule No. 2—Commercial and Small Industrial; Rate Schedule No. 3A—Industrial Process Uses; Rate Schedule No. 3B—Industrial Process Uses; Rate Schedule No. 4—Other Commercial and Industrial; Rate Schedule No. 5—Boiler Fuel; Rate Schedule No. 6—Large Boiler Fuel; Rate Schedule No. T-1—Transportation; the RE-1 Rate Schedule for service to municipal wholesale gas customers; and Rate Schedule No. S-1 for industrial and wholesale customers capable of switching from gas to oil.

In the proceedings below, NCNG requested the Commission to increase its rates by $8,577,027. This increase was to apply to Rate Schedule Nos. 1 and 2 and to some Industrial Process Users. At the same time NCNG sought to eliminate from its rate schedules the formula rate known as the Curtailment Tracking Rate (CTR). This formula operated to adjust NCNG's rates depending on the sales volume of gas available to the company. When sales declined due to a curtailment of supplies, the CTR caused rates to rise so that the company could earn the revenues necessary to meet its anticipated level of fixed cost and profit margin. If sales exceeded the volume expected when the base rates were set, the CTR would reduce the rates to reflect the higher level of fixed cost recovery. In the past the CTR had sometimes operated to raise rates and at other times had caused them to decline. At the time NCNG filed its request for increased rates, operation of the CTR had resulted in a price reduction of .01049 per therm (100,000 BTU's) for all rate schedules. As a result of the elimination of the CTR, NCNG's customers will have to pay an approximately $3,300,000 more for gas per year. This figure would vary upward or downward each year depending on NCNG's sales volume.

In its final order the Commission approved a rate increase of $1,117,531. It also implemented an Industrial Sales Tracker provision (IST) similar to that proposed by NCNG. Because of fluctuations in the price of oil, some of NCNG's customers in Rate Schedule Nos. 4, 5, 6 and RE-1, who are capable of doing so, switch to oil when its price drops below the rate set for a comparable amount of natural gas. As a result, the Commission has allowed NCNG to negotiate lower rates with those customers in order to retain their business. The IST enables NCNG to recover from its other customers, through surcharges, the profit margin lost on negotiated sales of gas. A "true-up" will be conducted at the end of each year. If the IST results in charges in excess of what NCNG needs to maintain its margin, the surplus will be refunded. If the company receives insufficient revenues to meet its allowed profit margin, it will recover the deficit through a uniform charge per therm to the customers in Rate Schedule Nos. 1, 2, 3 and the customers in Rate Schedule No. RE-1 who cannot switch to alternate fuels. Any profit earned by NCNG from new customers added after 30 June 1983 will not be considered in

determining whether NCNG has received sufficient revenue to meet its allowed profit margin.

NCNG maintains a gas service pipeline that was built to service a large industrial customer that has ceased operations. The pipeline is largely idle now and is used to store gas. NCNG's investment in the line has not yet been fully recovered. In its final order, the Commission included a portion of NCNG's remaining investment in the line in the investment base used to determine NCNG's rates.

Intervenors appealed from the Commission's order.

*McCoy, Weaver, Wiggins, Cleveland & Raper, by Donald W. McCoy and Alfred E. Cleveland for applicant-appellee North Carolina Natural Gas Corporation.*

*Jerry B. Fruitt for intervenor-appellant North Carolina Textile Manufacturers Association, Inc.*

*Spiegel & McDiarmid, by David R. Straus and Gary J. Newell and Spruill Lane Carlton McCotter & Jolly, by J. Phil Carlton and Ernie K. Murray for intervenor-appellants Cities of Wilson, Rocky Mount, Monroe and Greenville, North Carolina.*

BRANCH, Chief Justice.

Intervenors in the case at bar have excepted to a number of the findings and conclusions of the Commission. Insofar as their assignments of error are inconsistent, they will be treated separately.

I.

[1] North Carolina Textile Manufacturers Association, Inc. (TMA) argues that the Commission's findings of fact that NCNG had requested an increase in revenues of $8,577,027 and that the company should be allowed an increase of $1,117,531 are inadequate as a matter of law because they are not supported by competent and material evidence. We agree.

All final orders and decisions of the Commission shall be sufficient in detail to enable the court on appeal to determine the controverted questions presented in the proceedings and shall include:

(1) Findings and conclusions and the reasons or bases therefor upon all the material issues of fact, law, or discretion presented in the record, and

(2) The appropriate rule, order, sanction, relief or statement of denial thereof.

N.C. Gen. Stat. § 62-79(a) (1982). Findings of the Commission that are based on competent, material and substantial evidence are conclusive on appeal. *State ex rel. Utilities Comm. v. Conservation Council*, 312 N.C. 59, 64, 320 S.E. 2d 679, 683 (1984). On appeal, the scope of review is limited by N.C.G.S. § 62-94. *State ex rel. Utilities Commission v. Public Staff*, 309 N.C. 195, 207, 306 S.E. 2d 435, 442 (1983). In pertinent part the statute provides that the reviewing court may remand, reverse, or modify the decision of the Commission

if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:

. . .

(4) Affected by . . . errors of law, or

(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted. . . .

N.C. Gen. Stat. § 62-94(b) (1982).

The uncontradicted evidence before the Commission was that elimination of the CTR would result in an increase of approximately $3,300,000 per year in the bills paid by consumers. This is in addition to the $8,577,027 requested by NCNG. In its Finding of Fact No. 15 the Commission concluded that it was just and reasonable to allow NCNG an annual revenue increase of $1,117,531. In Finding of Fact No. 17 the Commission concluded that the CTR was outmoded and should be terminated. This finding of fact is supported by competent and material evidence and is binding on appeal. However, the effect of Finding of Fact No. 15 and Finding of Fact No. 17 was an annual revenue increase, at least for the year of 1983, of approximately $4,417,531. That being the case, the Commission was clearly acting under a misapprehension of the facts when it found an annual revenue increase of $1,117,531 to be just and reasonable.

NCNG attempts to meet this objection to the Commission's findings in two ways.

First, NCNG argues that this Court has previously determined that the CTR is not a general fixed rate or an adjustment to a general fixed rate. *Utilities Comm. v. Industries, Inc.*, 299 N.C. 504, 507-09, 263 S.E. 2d 559, 562-63 (1980). The implication being that since the CTR is not a general fixed rate any increase in consumer cost due to its elimination is not a rate increase. While this reasoning is attractive, it ignores the fact that the CTR was established as part of NCNG's basic rate structure. *Utilities Comm. v. Industries, Inc.*, 299 N.C. at 508, 263 S.E. 2d at 562. The reasonableness of the increase in consumer costs due to elimination of the CTR is a material issue of fact that must be dealt with by the Commission in its findings and conclusions. N.C. Gen. Stat. § 62-79(a) (1982). The Commission must find such increases to be necessary pursuant to N.C.G.S. § 62-133 before it may find NCNG's rates to be just and reasonable. *See Utilities Comm. v. Morgan*, 277 N.C. 255, 266, 177 S.E. 2d 405, 412 (1970).

NCNG next argues that the Commission was aware that elimination of the CTR would increase the company's revenues and impliedly found the increase to be just and reasonable. In its application for a rate increase, NCNG proposed the elimination of the CTR as well as requesting increased revenues. Public Staff witness Garrison and NCNG witnesses Teele and Wells all indicated in their testimony that elimination of the CTR would increase NCNG's revenues. In its evidence and conclusions for Finding of Fact No. 17, the Commission stated that since 1979, application of the CTR had resulted in NCNG making substantial refunds to its customers. NCNG also produced evidence of severe declines in earnings in recent years.

While this evidence makes it clear that the Commission was aware that eliminating the CTR would increase costs to consumers, there is no evidence that the Commission found the approximately $3,300,000 increase in costs to NCNG's customers to be just and reasonable. For that reason, the Commission's findings and conclusions are inadequate as a matter of law to support its conclusion that a rate increase of $1,117,531 is just and reasonable. On remand the Commission will make findings on

whether the increased rates brought about by the termination of the CTR are just and reasonable.

## II.

[2]   Both TMA and Cities contend that the rates and rate levels approved by the Commission are unjust and unreasonably discriminatory. They contend that the Commission's decision is erroneous as a matter of law and is not supported by the evidence. Cities also argue that the rates set by the Commission are anti-competitive.

"No public utility shall establish or maintain any *unreasonable* difference as to rates or services either as between localities or as between classes of service." N.C. Gen. Stat. § 62-140 (1982) (emphasis added). A substantial difference in service or conditions must exist to justify a difference in rates. *Utilities Comm. v. Edmisten*, 291 N.C. 424, 428, 230 S.E. 2d 647, 650 (1976). "There must be no *unreasonable* discrimination between those receiving the same kind and degree of service." *Utilities Comm. v. Mead Corp.*, 238 N.C. 451, 462, 78 S.E. 2d 290, 298 (1953) (emphasis added). While decisions of the Commission involving the exercise of its discretion in fixing rates are accorded great deference, *see Utilities Comm. v. Edmisten*, 291 N.C. at 428, 230 S.E. 2d at 650; *Utilities Comm. v. Coach Co. and Utilities Comm. v. Greyhound Corp.*, 260 N.C. 43, 54, 132 S.E. 2d 249, 254 (1963), the Commission has no power to authorize rates that result in unreasonable and unjust discrimination. *Utilities Comm. v. Edmisten*, 291 N.C. at 428, 230 S.E. 2d at 650; *Salisbury and Spencer Ry. v. Southern Power Co.*, 180 N.C. 422, 425, 105 S.E. 28, 29-30 (1920). In determining whether rate differences constitute unreasonable discrimination, a number of factors should be considered: "(1) quantity of use, (2) time of use, (3) manner of service, and (4) costs of rendering the two services." *Utilities Comm. v. Oil Co.*, 302 N.C. 14, 23, 273 S.E. 2d 232, 238 (1980). Other factors to be considered include "competitive conditions, consumption characteristics of the several classes and the value of service to each class, which is indicated to some extent by the cost of alternate fuels available." *Utilities Comm. v. City of Durham*, 282 N.C. 308, 314-15, 193 S.E. 2d 95, 100 (1972).

The evidence before the Commission makes it clear that there is substantial discrimination between the various classes of

customers. Residential customers in Rate Schedule No. 1 and commercial and small industrial customers in Rate Schedule No. 2 pay rates which yield a return considerably below the costs incurred by NCNG in serving them. The customers in the remaining rate schedules pay rates which yield returns in excess of their cost of service. The customers in Rate Schedule Nos. 3B, 4, 5 and 6 in particular pay rates which are far in excess of NCNG's cost of serving them. The effect of this rate structure is that the rates of residential, certain commercial and small industrial customers are subsidized by the remaining industrial, wholesale and commercial customers.

Cities and TMA both assign as error the Commission's failure to address their argument that the rates set by the Commission discriminate unreasonably between classes of customers in violation of N.C.G.S. § 62-140(a). Cities take this argument further and contend that end users of natural gas served by NCNG's wholesale customers are in the same class as end users served directly by NCNG and are being forced to pay unjust and discriminatory rates. Since the same standard of reasonableness is used to judge the validity of discrimination within and between classes of service, both arguments will be dealt with in the same way.

In light of the substantial difference between cost of service and rate of return for the various classes of customers, the question of unreasonable discrimination among and within the classes of service is a material issue of fact and of law. The Commission's failure to address this issue in its findings of fact is error prejudicing the substantial rights of defendants. Therefore, the case must be remanded to the Commission so that it may consider this issue and make appropriate findings. N.C. Gen. Stat. §§ 62-79(a) and 62-94(b); *Utilities Commission v. Public Staff*, 309 N.C. at 207-08, 306 S.E. 2d at 442.

[3] In lieu of rates based primarily on the cost of service to each class of customers, Cities proposed a plan whereby residential, small industrial and some commercial customers (Rate Schedule Nos. 1 and 2) would share the benefit of subsidized rates with the wholesale customers (Cities, Rate Schedule RE-1). Under this plan, the wholesale rate charged to Cities would be adjusted to reflect the cross-subsidization that exists among NCNG's retail customers. The rate charged to Cities would be based on the end

use made of the gas by the various classes of Cities' customers, just as the rates NCNG charges its retail customers are based on the use those customers make of the gas.

In rejecting this proposal the Commission concluded that while the plan had some merit it must be rejected because of the administrative difficulties it might create. At the hearing before the Commission no party argued that the plan proposed by Cities would be difficult to administer, and no evidence to this effect was put before the Commission. The Commission's belief that there would be serious problems for NCNG and Cities with respect to billings and revenues is not supported by evidence in the record. Under Cities' proposal the data showing the sales volume to Cities' various classes of customers during the test period would be used to determine the proper amount of cross-subsidization to be incorporated into the RE-1 Rate. Such data was produced at the hearing. Contrary to the Commission's fears, rates would be based not on varying monthly reports of end use sales volumes but on the test period data. Since Cities presently supply NCNG with monthly reports of sales volumes by customer class, there is sufficient evidence from which NCNG could establish rates in accordance with Cities' proposal. There is no evidence that the data furnished by Cities is unreliable, and NCNG uses it in reporting total sales by customer classes.

The Commission's finding that Cities' proposal is administratively unfeasible is not supported by competent and material evidence and is erroneous. N.C. Gen. Stat. § 62-94(b) (1982). On remand the Commission will decide whether the present rates result in unjust and unreasonable discrimination among ratepayers. If the Commission finds such discrimination to exist, it will examine the remedies proposed by TMA and Cities and decide if one of those or some other remedy is appropriate.

[4] In a related matter TMA argues that the Transportation Rate (T-1) approved by the Commission is unjust and unreasonable. This is the rate NCNG charges customers to transport gas that they have bought from other suppliers. As approved by the Commission, the T-1 rate allows the company to earn the same profit margin on customer-owned gas transported by NCNG that the company would earn had it provided the complete service to the customer. TMA argues that this takes away customers' incen-

tive to buy directly from the producers. Public Staff witness Garrison stated that to the extent the returns are excessive in Rate Schedule Nos. 4, 5 and 6, they are also excessive in the T-1 rate.

Since we have already ordered the Commission to decide whether the rates presently charged are discriminatory, it is proper that the T-1 rate be included in that determination.

We do not hold that it is unjust and unreasonable as a matter of law for a utility to earn the same profit margin on transported gas that it earns on its own retail sales of gas. TMA has not indicated that it argued this issue before the Commission or that the Commission failed to make adequate findings of this question. For that reason the Commission need not consider it on remand.

Cities urge that this Court find as a matter of law that: (1) end users of gas served by NCNG's wholesale customers are in the same classes as end users served directly by NCNG; (2) that the disparity in rates charged to end users who buy directly from NCNG and those who buy from NCNG's wholesale customers constitutes unreasonable and unjust discrimination; and (3) that on remand the Commission be ordered to adopt rates for NCNG's wholesale customers that reflect the cross-subsidies among groups of end users served by wholesale customers. We do not think it proper at this stage of the case that we rule on these matters.

All of these questions contain issues of fact as well as issues of law. Until the Commission has considered these questions and made findings of fact which we can review, it is inappropriate for us to make a final ruling.

[5]   We note that Cities contend that they and NCNG are competitors in the retail sale of natural gas. Cities then argue that NCNG's rate structure is anticompetitive because wholesale customers like Cities cannot buy gas from NCNG at the price set in Rate Schedule RE-1 and sell gas to their own customers at prices competitive with NCNG's retail rates. We wish to make it clear that the rates of public utilities under the jurisdiction of the Utilities Commission are not subject to attack on the basis that they violate the antitrust laws. *See Parker v. Brown*, 317 U.S. 341, 351-52 (1943); *Washington Gas Light Co. v. Virginia Electric and Power Co.*, 438 F. 2d 248, 251-52 (4th Cir. 1971). Challenges to

rates are limited by the legal theories provided by the Public Utilities Act.

### III.

[6]  Cities and TMA assign as error the adoption by the Commission of the IST on the basis that it results in unjust and unreasonable discrimination among the customers served by NCNG in violation of N.C.G.S. § 62-140(a). After a careful review of the record, we hold that the Commission erred in implementing the IST in its present form.

For a proper understanding of these issues a brief explanation of how the IST operates is in order. The IST applies to customers presently being served under Rate Schedule Nos. 4, 5, 6 and RE-1 that are capable of using heavy fuel oil as an alternate fuel. The Commission estimated the level of fixed cost recovery NCNG would obtain from these customers by subtracting projected variable costs from the revenues NCNG could expect to receive from IST customers. This calculation was based on anticipated sales and oil prices. The resulting figure is NCNG's allowed profit margin. If oil prices drop so that heavy fuel oil becomes cheaper to use than natural gas forcing NCNG to negotiate lower rates with its IST customers, the IST allows NCNG to add a surcharge to the rates of customers not covered by the IST to maintain its profit margin. If oil prices should increase allowing NCNG to make profits in excess of its allowed profit margin, the excess is passed on to the non-IST customers by a credit. At the end of each year there is a "true-up."

The features of the IST that are objectionable to Cities and TMA are as follows. Cities object to the fact that profits from sales to *new* industrial and large commercial customers not covered by the IST will not be included in the computations used to determine whether NCNG is recovering its allowed profit margin. As a compromise measure, Cities are willing to accept the IST if half of any profits above the allowed margin earned by NCNG on sales to industrial and large commercial customers added after 30 June 1983 are shared with NCNG's customers by adding them into the IST computations. TMA shares the view that profits earned from new industrial and large commercial customers should be included in the computations and contends that profits from (1) increased sales to present industrial

customers not covered by the IST; and (2) increased sales to residential and commercial customers should be included in the computations. TMA points out that the IST causes discrimination within classes of customers because customers included in the IST are not subject to surcharges and receive no refunds. TMA objects to the idea of treating customers differently on the basis of their ability to switch from gas to fuel oil and argues that the IST concept results in rates that are impermissibly discriminatory.

Both Cities and TMA contend that under the present version of the IST it will be possible for NCNG to show a decrease in profits from its IST customers entitling it to a surcharge at the same time that it is earning large profits in other markets that, if included in the computations, would obviate the need for any surcharge.

In its Finding of Fact No. 18 the Commission stated that "[n]ew customers added after June 30, 1983, are specifically excluded from the IST." In the Evidence and Conclusions for Finding of Fact No. 19 the Commission noted that both the Public Staff and NCNG proposed the exclusion of customers added after 30 June 1983 in order to give NCNG incentive to expand its sales base by adding new industrial customers. The purpose is to allow NCNG to earn some return on the new plant investments it will need to make to attach new customers to its system. The Commission noted that Cities had proposed that the IST include new customers added after 30 June 1983 but concluded that it was fair and reasonable to exclude those new customers from the IST. This appears to be the Commission's sole answer to the objections raised by Cities and TMA. As such it is clearly inadequate.

At a minimum the Commission must summarize the arguments made by parties to the case so that a reviewing court will be able to "ascertain the controverted questions presented in the proceedings." *Utilities Commission v. Conservation Council*, 312 N.C. at 62, 320 S.E. 2d at 682. Here, the Commission completely ignored the discrimination arguments put forward by TMA. This along with the Commission's mere passing reference to Cities' objections to excluding new customers from the IST is sufficient to justify the Court in remanding this issue for additional findings. Further, we hold that excluding new industrial and large commer-

cial customers from the operation of the IST is unjust and unreasonable as a matter of law.

Apparently, the Commission's only reason for excluding these new customers from the IST and allowing NCNG to keep all the profits generated by them is that this will encourage NCNG to seek new customers by holding out the prospect of increased profits to help defray the costs of bringing the new customers into the system. While this is a legitimate concern, it does not justify the disparate treatment accorded to NCNG's customers by the IST as it is presently formulated. *See generally Utilities Comm. v. Edmisten*, 291 N.C. at 428, 230 S.E. 2d at 650; *Utilities Comm. v. Oil Co.*, 302 N.C. at 23, 273 S.E. 2d at 238; *Utilities Comm. v. City of Durham*, 282 N.C. at 314-15, 193 S.E. 2d at 100; N.C. Gen. Stat. § 62-140(a) (1982).

Under the rate structure approved by the Commission, most business risks associated with the sale of gas to large industrial and commercial customers are shifted to NCNG's ratepayers while NCNG retains significant benefits for itself. If falling oil prices force NCNG to negotiate lower rates with its IST customers which cut into its allowed profit margin, it may recover that loss through a surcharge to its other customers. At the same time NCNG will retain any profits it makes from new customers as "incentive." Should falling oil prices or some other contingency prevent NCNG from recovering its fixed costs and allowed profit margin associated with its new customers, it would be free to file for a rate increase to recover those costs. The fact that ratepayers will receive the benefit from sales to these new customers the next time NCNG files for a change in its base rates is irrelevant since NCNG will have little incentive to file for an increase if it makes large profits from these customers. Under this system, NCNG has the chance to earn large profits from new customers while protecting itself from losses at the expense of a select portion of its ratepayers. Such discrimination is unreasonable.

Since the loss of C. F. Industries (CFI) as a customer, NCNG has been under pressure to find new customers to use the gas allotted to CFI. NCNG wants the allotment to meet peak demand requirements of its high priority customers and needs new industrial or commercial customers so that the company may continue to purchase the gas pursuant to its contract with Transco

State ex rel. Utilities Comm. v. N. C. Textile Manufacturers Assoc., Inc.

and avoid penalty payments.[1] This in itself is a strong incentive for NCNG to find new industrial and large commercial customers.

NCNG is allowed to request contributions from prospective customers to aid in construction of new facilities to serve those customers and often does so. The company may file for a rate increase if it feels that such investments must be included in the rate base in order for it to obtain adequate earnings. Further, some of NCNG's new customers would receive their gas from the lateral transmission line built to serve CFI. This line is included in the company's rate base, yet the IST would deny the ratepayers any benefit from the profits earned on this line. Because NCNG has open to it two methods of recovering the exact costs it expends on connecting new customers to its system, it is improper to allow it such an imprecise method as retaining all profits from new customers.

On remand, any form of the IST considered will include new customers added to NCNG's system after 30 June 1983. The Commission will then consider TMA's contention that the IST is unreasonably discriminatory and make appropriate findings of fact.

## IV.

[7]   Lastly, Cities assign as error the Commission's failure to exclude from NCNG's rate base the pipeline built to serve CFI. Cities' argument is based on the fact that the line is presently idle except for use as storage, and any new customers using the line would not be included in the IST. Cities contend that the Commission was required to address the issue of whether the CFI line should have been included in the rate base if new customers using the line are to be excluded from the IST. Since we have held that new customers added after 30 June 1983 may not be excluded from the IST, Cities' objections to inclusion of the CFI line have been satisfied.

The test for whether the cost of facilities of a public utility may be included in the rate base is whether such facilities are

---

1. It is difficult to determine the extent to which NCNG actually needs the gas formerly going to CFI in order to meet its peak day demands. The company has arrangements to buy supplemental gas from Piedmont Natural Gas Company through the winter of 1984-85. NCNG also intends to construct a gas storage facility to assist in meeting peak day demands.

used and useful. *Utilities Comm. v. Power Co.*, 285 N.C. 377, 387, 206 S.E. 2d 269, 276 (1974). Any costs recovered as construction work in progress pursuant to N.C.G.S. § 62-133 are, of course, excluded from this computation. "[T]he fact that a transmission line . . . is not presently used to its full capacity does not necessarily justify the exclusion of any portion of it from the rate base on the theory that such portion is not presently 'used and useful' in rendering service." *Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 353, 189 S.E. 2d 705, 728 (1972). Whether specific facilities are used and useful is a question of fact to be determined by the Commission. *Utilities Comm. v. Telephone Co.*, 281 N.C. at 354, 189 S.E. 2d at 728. The CFI line was used and useful by virtue of its use as a storage facility, and the Commission's finding that it should be included in the rate base is supported by competent and material evidence and so is binding on appeal. *Utilities Commission v. Conservation Council*, 312 N.C. at 64, 320 S.E. 2d at 683.

For the reasons stated, we reverse in part and affirm in part the Final Order of the Utilities Commission and remand this case for proceedings consistent with this opinion.

Reversed in part; affirmed in part.