State ex rel. Utilities Comm. v. N.C. Natural Gas Corp.

STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION, PUBLIC STAFF—NORTH CAROLINA UTILITIES COMMISSION v. NORTH CAROLINA NATURAL GAS CORPORATION

No. 660A87

(Filed 4 January 1989)

**1. Gas § 1— natural gas rates—gas-in-kind retained from transportation customers—consideration as transportation revenues**

The Utilities Commission's finding and conclusion that the value of gas-in-kind retained by a natural gas company from T-1 transportation customers as a line loss and compressor fuel charge should be included in the IST mechanism as transportation revenues was not arbitrary and capricious and was supported by the evidence in view of the entire record.

**2. Gas § 1; Utilities Commission § 21— natural gas rates—line loss and compressor fuel charge—refund not retroactive ratemaking**

The Utilities Commission's order requiring a natural gas company to refund to certain customers the monies collected pursuant to a two percent line loss and compressor fuel charge previously assessed against its transportation customers did not constitute retroactive ratemaking in excess of the Commission's statutory authority.

**3. Gas § 1; Utilities Commission § 24— natural gas rates—inclusion of collected line loss charges in IST—no impairment of contract—no due process violation**

The Utilities Commission's order requiring that monies collected by a natural gas company pursuant to a line loss and compressor fuel charge be included in the IST does not amount to an impairment of contract in violation of Art. I, § 10, cl. 1 of the U. S. Constitution or an unlawful taking of property other than by the law of the land or without due process in violation of Art. I, § 19 of the N. C. Constitution.

APPEAL by North Carolina Natural Gas Corporation (NCNG) pursuant to N.C.G.S. § 7A-29(b) from the Utilities Commission's (Commission) Final Order On Further Hearing entered on 25 September 1987 in Docket No. G-21, Sub 255. Heard in the Supreme Court 12 September 1988.

*Robert P. Gruber, Executive Director, by Antoinette R. Wike, Chief Counsel, and Gisele L. Rankin, Staff Attorney, for the Public Staff—North Carolina Utilities Commission, appellee.*

*McCoy, Weaver, Wiggins, Cleveland & Raper, by Donald W. McCoy and Jeffrey N. Surles, for North Carolina Natural Gas Corporation, appellant.*

EXUM, Chief Justice.

The questions presented on this appeal are whether: (1) the Commission's finding and conclusion that the value of gas-in-kind retained by NCNG should be treated as revenues is arbitrary or capricious and unsupported by the evidence in view of the entire record; (2) the Commission's order requiring NCNG to refund to certain customers the monies collected pursuant to a line loss and compressor fuel charge previously assessed from other customers constitutes retroactive ratemaking in excess of the Commission's statutory authority; and (3) the Commission's order requiring that monies collected pursuant to a line loss and compressor fuel charge be included in the IST[1] amounts to an unconstitutional impairment of contract and an unlawful taking of property other than by the law of the land or without due process in violation of the North Carolina and United States Constitutions.[2] We affirm the Commission's order.

## I.

NCNG is a franchised public utility providing natural gas service in south central and eastern North Carolina to residential, commercial and industrial customers. NCNG also provides wholesale service to municipalities which, in turn, serve their own mix of customers from industrial to residential. Finally, NCNG provides transportation service for customer owned gas (gas purchased from suppliers other than NCNG but "transported" by NCNG over its lines) to certain large industrials. All of NCNG's natural gas supply, including customer owned gas, is delivered to it by Transcontinental Gas Pipeline Corporation (Transco).

---

1. The Industrial Sales Tracker (IST) is a deferred account established to protect NCNG's margins (i.e., tariff price for gas less the cost of gas and gross receipts tax) on sales to customers who have the capability to use alternative fuels. *See State ex rel. Utilities Comm. v. N.C. Textile Manufacturers Assoc., Inc.*, 313 N.C. 215, 226, 328 S.E. 2d 264, 271 (1985). The IST compares the total margin earned under negotiated rates and transportation rates with an allowed margin based on anticipated sales. The IST then requires margin in excess of the allowed margin to be refunded to non-IST customers or a deficit margin charged to such customers by way of an annual true-up. *Id.* In addition, the IST specifically provides that transportation revenues collected pursuant to Rate Schedule T-1 are to be accounted for in the IST true-up.

2. More specifically, at issue here are the contracts clause under article I, § 10, of the United States Constitution and the law of the land clause under article I, § 19 of the North Carolina Constitution.

NCNG has separate retail rate schedules for residential, commercial and small industrial, industrial process, and other commercial and industrial customers.[3] Industrial customers with alternate fuel capability may be served under negotiated Rate Schedules S-1 and SM-1.[4] NCNG also has two transportation rate schedules, T-1 and T-2, under which it transports customer owned gas.[5]

Before these proceedings Rate Schedule T-1 contained the following paragraph:

1. Availability

This rate schedule is available at the Company's discretion to any industrial boiler customer who:

. . . .

(3) enters into a service agreement with the company. The service agreement shall state the total entitlement volume and the average daily entitlement volume to be delivered in each seasonal period. Customer's entitlement volume shall be the volume of gas received from Transco for Customer's account, less line loss volumes.

Transportation Rate Schedule T-2 had a similar provision:

1. Availability

This rate schedule is available at the Company's discretion to any interruptible commercial or industrial customer

---

3. These schedules include: Rate Schedule 1—Residential; Rate Schedule 2—Commercial and Small Industrial; Rate Schedule 3A and 3B—Industrial Process Uses; Rate Schedule 4A—Other Commercial and Industrial Non-IST customers; Rate Schedule 4B—Other Commercial and Industrial IST customers; Rate Schedule 5A—Boiler Fuel Non-IST customers; Rate Schedule 5B—Boiler Fuel IST customers; Rate Schedule 6A—Large Boiler Fuel Non-IST customers; Rate Schedule 6B—Large Boiler Fuel IST customers.

4. Rate Schedule S-1 is a negotiated rate charged to industrials served by NCNG. Rate Schedule SM-1 is a negotiated rate charged to municipalities for gas destined to be resold by the municipalities to their respective industrial customers with alternate fuel capability.

5. Rate Schedule T-1 is the transportation rate applicable to boiler fuel industrial volumes. Rate Schedule T-2 is the transportation rate applicable to non-boiler fuel industrial volumes.

which meets the criteria set forth in North Carolina Utilities Commission Rule 60-19.2 for Priorities 2.8, 3, 4 and 5 . . . which:

. . . .

(3) enters into a service agreement with the Company. The service agreement shall state the maximum hourly and daily demand volume and the total entitlement volume. Customer's entitlement volume shall be the volume of gas received from Transco for customer's account less compressor fuel and line loss volumes.

NCNG entered into standard service agreements with customers being charged under the T-1 and T-2 rate schedules. The customer contracts included the following language:

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements hereof and other good and valuable considerations, the Company and Customer have agreed and do hereby covenant and each agrees with the other as follows, to wit:

. . . .

3. Customer's 'entitlement volume' shall be the volume of gas received from Transco for Customer's account, less 2% to be retained by Company for compressor fuel and line loss volumes.

4. Company agrees to accept Customer's gas from Transco and deliver Customer's 'entitlement volume' to Customer.

Rate Schedule T-1 was initially proposed by NCNG in September 1975 and was "allowed to become effective as filed" by Commission action on 29 September 1975. In June 1983 NCNG proposed certain changes to Rate Schedule T-1 and by Commission order of 6 January 1984, the Commission found "that the T-1 rate proposed by the Company is just and reasonable."

Rate Schedule T-2 was proposed by NCNG in May 1985. By order of 30 May 1985 the Commission provided that Rate Schedule T-2 "be accept[ed] for filing effective June 15, 1985." Rate Schedule T-2, however, was never established as just and reasonable.

The dates relevant to this proceeding are from 1 October 1984 through 30 September 1986. During this period of time NCNG charges to its transportation and negotiated sales customers include $921,974, which consists of: (1) $438,920, which is the value of gas retained by NCNG that represents two percent of Rate Schedules T-1 and T-2 customers' transported volumes, and (2) $483,054, which is a two percent charge on negotiated sales of spot market gas to customers served under Rate Schedules S-1 and SM-1.

On 10 November 1986 the Commission issued a "Final Order" pursuant to a general rate case which stated in part:

19. The language in Rate Schedules T-1 and T-2 on which N.C.N.G. has relied to impose a 2% allowance for compressor fuel and line loss volumes in its transportation service and negotiated sales should be deleted from those tariffs as of the date of this Order. A further hearing will be held to decide the disposition of the monies collected pursuant to this allowance in the past. . . .

IT IS, THEREFORE, ORDERED as follows:

. . . .

5. That N.C.N.G. shall, as of the date of this Order, terminate the 2% line loss and compressor fuel charge currently being assessed customers for transportation service and negotiated sales.

On 5 December 1986 the Commission scheduled a further hearing pursuant to the Final Order of 10 November 1986. The purpose of the hearing was to address the issue of how to handle the proceeds collected pursuant to NCNG's two percent line loss and compressor fuel charge assessed customers for transportation service and negotiated sales. A hearing panel consisting of Commissioner Ruth E. Cook, presiding, and Commissioners Edward B. Hipp and Sarah Lindsay Tate heard testimony and reviewed evidence in Raleigh on 3 March 1987. The panel entered a "Recommended Order On Further Hearing" on 19 May 1987, with Commissioner Cook dissenting in part and concurring in part.[6]

---

6. Commissioner Cook concurred with the majority order requiring NCNG to refund the two percent allowance collected by it for transportation service under

State ex rel. Utilities Comm. v. N.C. Natural Gas Corp.

The order included the following three significant conclusions and findings of fact:[7]

> 5. . . . Rate Schedule T-1 was established as just and reasonable by the Commission and NCNG should be allowed to retain the funds received under its T-1 tariff.
>
> 6. . . . Rate Schedule T-2 was not established as just and reasonable and the 2% allowance retained as gas-in-kind by NCNG pursuant to transportation service under Rate Schedule T-2 was unjust and unreasonable. NCNG must refund the monies collected pursuant thereto. The value of gas-in-kind retained by NCNG under its T-2 tariff should be treated as transportation revenues and flowed through the IST to be refunded to the non-IST customers on the system during October 1, 1984, through April 30, 1986, and also during the month of September 1986, the time period during which these 2% retentions occurred.
>
> 7. Rate Schedules S-1 and SM-1 contain no language authorizing an allowance for lost and unaccounted for gas and compressor fuel on negotiated sales. The $483,054 cost imputed into the IST on sales of spot market gas should be flowed back through the IST and should be refunded to the non-IST customers on the system during November 1, 1985, through

Rate Schedule T-2 and negotiated sales under Rate Schedules S-1 and SM-1. She "strongly dissent[ed]," however, from the majority's findings and conclusion allowing NCNG to retain the two percent allowance collected by it for transportation service under Rate Schedule T-1. Commissioner Cook equates this allowance to an over-recovery arising "as a result of the Majority's willingness to allow NCNG to interpret its T-1 tariff to a degree that, . . . far exceeds the bounds of reasonableness." In addition, she states the majority's conclusion "allows NCNG to totally disregard the provisions of NCNG's . . . []IST[] rider."

7. In this and other orders of the Commission referred to in this opinion the Commission's summary of evidence, findings of fact, and conclusions of law are mixed together in portions of the orders denominated "Findings of Fact" and "Evidence and Conclusions for Findings of Fact." Throughout this opinion we have tried to distinguish between and denominate findings and conclusions on the basis of the distinctions we drew in State ex rel. Utilities Comm. v. Public Staff, 322 N.C. 689, 693, 370 S.E. 2d 567, 570 (1988) and State ex rel. Utilities Comm. v. Eddleman, 320 N.C. 344, 351-52, 358 S.E. 2d 339, 346 (1987). As this Court noted in Eddleman, "[a]s long as 'each link in the chain of reasoning' appears in the Commission's order, mislabeling is merely an inconvenience to the courts." Eddleman, 320 N.C. at 352, 358 S.E. 2d at 346.

September 30, 1986, the time period during which these cost imputations occurred.

Carolina Utility Customers Association, Inc. (CUCA), NCNG, and Public Staff duly filed exceptions to the hearing panel's Recommended Order On Further Hearing. The full Commission held oral arguments on the exceptions on 27 July 1987.

The Commission entered its "Final Order On Further Hearing" on 25 September 1987. The Commission concluded "[t]he $483,054 cost imputed into the IST on sales of spot market gas [under Rate Schedules S-1 and SM-1] should be flowed back through the IST and should be refunded to the non-IST customers on the system during November 1, 1985, through September 30, 1986, the time period during which these cost imputations occurred." In addition, the Commission found "[t]he value of gas-in-kind retained by NCNG under its T-1 and T-2 tariffs in the amount of $438,920 should be treated as transportation revenues and flowed through the IST to be refunded to the non-IST customers on the system during the time period during which these 2% retentions occurred." Commissioner Cook concurred in part and dissented in part.[8] Commissioner Hipp also dissented.[9]

NCNG filed a "Motion For Partial Stay Of Final Order On Further Hearing" which was granted by the Commission on 26 December 1987. NCNG now appeals from the Commission's Final Order On Further Hearing, but only as to the validity of the required refund of the two percent monies collected pursuant to Rate Schedule T-1.[10]

8. Commissioner Cook concurred in the decision of the Commission to refund the two percent monies collected pursuant to Rate Schedule T-1 through operation of the IST. She dissented, however, on "the majority's failure to recognize the validity of the Public Staff's argument that the language in Rate Schedule T-1 is too vague to establish the 2% retention of gas-in-kind by NCNG."

9. Commissioner Hipp dissented because he believes the majority's order "interferes with contracts lawfully entered into between the gas company as a transportation carrier of gas and its shippers under [the T-1] tariffs approved by the Commission, and therefore deprives the company of property without due process of law."

10. In compliance with the Commission's order NCNG has refunded or distributed through the IST the value of gas retained under Rate Schedule T-2 and the cost imputed for line loss on negotiated sales under Rate Schedules S-1 and SM-1 for a total of $607,032. NCNG does not appeal those portions of the order.

## II.

On appeal, NCNG presses three basic contentions. First, NCNG argues the Commission's finding and conclusion that the value of gas-in-kind retained by NCNG under its T-1 tariff should be treated as transportation revenues is arbitrary and capricious and unsupported by the evidence as a whole. Second, NCNG argues the Commission's order requiring refund of monies collected pursuant to a two percent line loss and compressor fuel charge it assessed its customers on Rate Schedule T-1 constitutes retroactive ratemaking in excess of the Commission's statutory authority. Last, NCNG argues the Commission's order also amounts to an impairment of contract and an unlawful taking of property other than by the law of the land or without due process in violation of the North Carolina and United States Constitutions. We will treat these arguments seriatim.

## A.

[1] NCNG contends on this appeal that the finding and conclusion of the Commission that revenues to be refunded under the IST include the value of gas retained from T-1 transportation volumes to cover line losses is arbitrary or capricious and unsupported by evidence in view of the entire record. Public Staff responds that "[b]ased on the evidence and the language of the tariffs in question, the Commission properly concluded that a reasonable and representative allowance for compressor fuel and lost and unaccounted for gas volumes was included in NCNG's rates during the period in question and that, since the IST rider was a part of NCNG's rate structure approved at that time, it was proper to flow the value of the gas retained, which amounted to an overcharge, into the IST." We agree with Public Staff.

In determining the appropriate disposition of the two percent monies collected by NCNG pursuant to Rate Schedule T-1 the Commission relied heavily on the testimony of Public Staff witness Eugene H. Curtis, Jr. and the language of the IST tariff. During the hearings held in March 1987, for the express purpose

---

NCNG has not, however, paid to the IST $314,942 which constitutes the value of gas retained on T-1 volumes. This amount is the subject of NCNG's present appeal. Carolina Utilities Customers Association, Inc. (CUCA) chose not to join in this appeal.

of the resolution of the two percent issues, Public Staff witness Curtis testified that at the time involved in this proceeding, transportation revenues collected from T-1 customers flowed through the IST to benefit all non-IST customers. He explained that the two percent gas volumes retained by NCNG from T-1 customers are eventually sold and converted to dollars received by NCNG. He concluded that these dollars should be treated as transportation revenues and flowed through the IST. In addition, during the hearings held in August 1986, involving the Company's overall general rate increase application, Public Staff witness Curtis testified that NCNG had provided no basis on which the two percent retained gas volumes could be justified in terms of cost. He further explained that it was the Public Staff's position that there was no reason to add this cost to the T-1 transportation customers' bills because the T-1 rate itself included the cost of providing service to these customers. Curtis again concluded that any additional recoveries of dollars or retained gas should flow to the customers of NCNG through the IST.

The Commission also closely examined the language of the IST provision. The Commission found that the original IST, approved by Commission order effective 12 December 1983, provided that "[t]he transportation revenues collected pursuant to Rate Schedule No. T-1 . . . will be refunded in the IST true-up." The Commission also found the revised IST, effective 1 May 1986, provided in pertinent part, "[a]ll revenues less gross receipts tax received by the Company for transportation service to customers . . . will be included in the IST deferred account." In addition, the Commission found that in Docket No. G-21, Sub 235, the Commission established the base rates which were in effect during the time period at issue in this proceeding. In that docket, the Commission had included a "reasonable and representative" allowance for compressor fuel and lost and unaccounted for gas volumes and the approved rates were designed to allow the Company to recover these costs. Furthermore, the Commission found the IST mechanism to be a part of NCNG's rate structure approved at that time.

N.C.G.S. § 62-94 prescribes the scope of appellate review of a decision by the Commission. Under this standard, the reviewing court

(b) . . . shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of any Commission action. The court may affirm or reverse the decision of the Commission, declare the same null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:

(1) In violation of constitutional provisions, or

(2) In excess of statutory authority or jurisdiction of the Commission, or

(3) Made upon unlawful proceedings, or

(4) Affected by other errors of law, or

(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or

(6) Arbitrary or capricious.

(c) In making the foregoing determinations, the court shall review the whole record or such portions thereof as may be cited by any party and due account shall be taken of the rule of prejudicial error.

N.C.G.S. § 62-94 (1982 Repl. Vol.). This Court's statutory function is to assess whether the Commission's order is affected by errors of law, and to determine whether there is substantial evidence, in view of the entire record, to support the position adopted. *State ex rel. Utilities Comm. v. Carolina Utility Customers Assoc.*, 323 N.C. 238, 243-44, 372 S.E. 2d 692, 695 (1988); *see, e.g., State ex rel. Utilities Comm. v. Eddleman*, 320 N.C. 344, 355, 358 S.E. 2d 339, 347 (1987); *State ex rel. Utilities Comm. v. Thornburg, Atty. Gen.*, 316 N.C. 238, 242, 342 S.E. 2d 28, 31-32 (1986); *State ex rel. Utilities Commission v. Carolina Utilities Customers Assoc.*, 314 N.C. 171, 179-80, 333 S.E. 2d 259, 265 (1985).

With these principles in mind we hold that the Commission's conclusion that the two percent monies collected pursuant to Rate Schedule T-1 must be included in the IST true-up is not arbitrary and capricious and is supported by competent, material and sub-

stantial evidence in view of the entire record. The Commission's Final Order On Further Hearing shows the Commission carefully considered and reviewed several sources of evidence. These include the Commission's records, which contain testimony taken in earlier hearings and tariffs previously approved by the Commission, the Commission's Recommended Order On Further Hearing issued May 19, 1987, and statements of CUCA, Public Staff, and NCNG. Based upon the preceding evidence and findings made therefrom, the Commission reached the following conclusion:

> [I]n accordance with the IST mechanism it is proper to flow the revenues at issue into the IST. The Commission believes that the 2% monies collected pursuant to Rate Schedule T-1 constitute "transportation revenues" and therefore must be included in the IST true-up. The term "revenues" is very comprehensive; it generally includes all monies received from whatever source and in whatever manner. . . . NCNG's failure to include the 2% monies in the IST was at odds with the language of the IST, and a refund through the IST must be ordered.

NCNG's contrary position on this issue must fail. The substance of its argument is that the Commission, by including the value of gas retained under Rate Schedule T-1 in the IST mechanism as transportation revenues, has equated losses with revenues and therefore its finding is arbitrary and capricious and unsupported by the record as a whole. We disagree.

The term "loss" is defined as "synonymous with, or equivalent to, 'damage', 'damages', 'deprivation', 'detriment', 'injury', and 'privation.'" Black's Law Dictionary 851 (rev. 5th ed. 1979). The term "revenue" is defined as "[r]eturn or yield, as of land; profit, as that which returns or comes back from an investment; the annual or periodical rents, profits, interest or issues of any species of property, real or personal; income of individual, corporation, government, etc." *Id*. at 1185. The record in this proceeding does contain competent, material and substantial evidence to support the Commission's conclusion that the two percent gas volumes retained from T-1 customers does constitute a "revenue" rather than a "loss." This evidence includes the following: Public Staff witness Curtis testified that NCNG's two percent retained gas volumes were not losses, but were eventually

sold and converted into dollars received by the company. NCNG witness Gerald A. Teele denied that the two percent allowance represented additional transportation revenue. Teele, however, admitted that the allowance could be classified as "compensation to the Company." In addition, the evidence was uncontroverted that the approved T-1 rates, which were in effect during the time period at issue in this proceeding, already included a built-in allowance to NCNG for compressor fuel and lost and unaccounted for gas volumes. NCNG witness Teele admitted on cross-examination that though the company does keep records of lost and unaccounted for gas, he could not show the Commission that the company's actual losses exceeded this existing allowance.

Considering the above evidence and the record as a whole, we hold the Commission's conclusion is supported by substantial, competent evidence in view of the entire record.

B.

[2] NCNG also argues that the Commission's order requiring NCNG to include the two percent monies in the IST as transportation revenues constitutes retroactive ratemaking in excess of the Commission's statutory authority. Public Staff counters, claiming the Commission's order "bears no resemblance to . . . retroactive ratemaking as condemned by this Court . . . ." We agree with Public Staff.

"[R]etroactive rate making occurs when an additional charge is made for past use of utility service, or the utility is required to refund revenues collected, pursuant to then lawfully established rates, for such past use." *Utilities Commission v. Edmisten, Atty. General*, 291 N.C. 451, 468, 232 S.E. 2d 184, 194 (1977). It is improper to require a utility to refund monies which it had been validly authorized to collect for recovery of anticipated expenses, though the expenses never actually materialized. *Id.* at 469, 232 S.E. 2d at 195. Generally, retroactive ratemaking is improper. *Id.* at 468, 232 S.E. 2d at 194; *see Utilities Commission v. City of Durham*, 282 N.C. 308, 318, 193 S.E. 2d 95, 102 (1972) (Utilities Commission may not fix rates retroactively so as to make them collectible for past service).[11]

11. This decision relies on this Court's interpretation of N.C.G.S. § 62-136, which states in part:

With these principles in mind, we hold the Commission's order does not constitute retroactive ratemaking. Here the Commission's order does not require NCNG to refund monies which it had been properly authorized to collect. Nor is this case analogous to our decision in *City of Durham,* when we refused to require a refund of interim rate increases since the rates charged were neither excessive nor unreasonable. *City of Durham,* 282 N.C. at 318-19, 193 S.E. 2d at 103. In contrast, here the Commission's order merely requires NCNG to abide by the rate structure in existence at the time the two percent monies were collected from T-1 customers. The Commission found: (1) the relevant rate structure included the IST mechanism; (2) the IST mechanism expressly provided T-1 transportation revenues to be refunded in the IST true-up; and (3) the two percent monies collected by NCNG from its T-1 transportation customers had not been flowed through the IST. All three of the above findings were uncontroverted. Finally, the Commission concluded the two percent monies were "revenues" under the IST and were therefore inappropriately excluded from the IST true-up. As noted above in section II. A. of this opinion, we agree with this conclusion for the reasons stated.

We hold, on this record, that the Commission's order does not constitute unlawful retroactive ratemaking.

## C.

[3] NCNG argues the Commission's actions in this proceeding amount to an impairment of contract and an unlawful taking of property other than by the law of the land or without due process in violation of the North Carolina and United States Constitutions. More specifically, NCNG contends the Commission's action requiring NCNG to pay into the IST the value of gas retained constitutes impairment of the obligation of contracts in violation of the contracts clause under article I, section 10, of the United States Constitution. NCNG also contends the Commission's order

(a) Whenever the Commission, . . . finds that the existing rates in effect and collected by any public utility are unjust, unreasonable, insufficient or discriminatory, or in violation of any provision of law, the Commission shall determine the just, reasonable, and sufficient and nondiscriminatory rates to be thereafter observed and in force, and shall fix the same by order.

retroactively charges NCNG for the value of line loss allowances and requires it to bear the expense with no consideration of the additional line loss for customer owned volumes transported in addition to its system load. NCNG contends the Commission's action amounts to a taking of its property contrary to the law of the land and without due process in violation of article I, section 19 of the North Carolina Constitution. Public Staff counters, claiming the Commission's requirement that NCNG include the value of the two percent monies in the IST does not amount to an impairment of contract nor an unlawful taking of property other than by the law of the land or without due process. We agree with Public Staff.

Article I, section 10, clause 1, of the United States Constitution provides that "No state shall . . . pass any . . . law impairing the obligations of contracts . . . ." In interpreting this provision in the context of regulated utilities we have stated:

> [I]t is well settled in this State that rates for public utility service fixed by an order of the Commission, otherwise lawful, supersede contrary provisions in private contracts concerning rates for such service. *The enforcement of such an order of the Commission does not constitute an impairment of the obligation of such contract*, in violation of the Contract Clause of the United States Constitution, since contracts of public utilities, fixing rates for service, are subject to the police power of the State.

*Utilities Comm. v. Power Co.*, 285 N.C. 398, 406, 206 S.E. 2d 283, 290 (1974) (citations omitted and emphasis added).

Article I, section 19 of the North Carolina Constitution provides in part: "No person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land." This Court has recognized "[u]nder the police power the state has authority to enact legislation to regulate the charges and business of a public utility . . ." *Paper Co. v. Sanitary District*, 232 N.C. 421, 430, 61 S.E. 2d 378, 385 (1950) (quoting with approval, *Schiller Piano Co. v. Illinois Northern Utilities Co.*, 288 Ill. 580, 585, 123 N.E. 631, 633 (1919) ). Moreover, in *In re Hospital*, 282 N.C. 542, 550, 193 S.E. 2d 729, 735 (1973), we explained:

Any exercise by the State of its police power is, of course, a deprivation of liberty. *Whether it is a violation of the Law of the Land Clause or a valid exercise of the police power is a question of degree and of reasonableness in relation to the public good likely to result from it.* To deny a . . . corporation the right to engage in a business . . . is a far greater restriction upon . . . its liberty than *to deny the right to charge in that business whatever prices the owner sees fit to charge for service.* Consequently, such a deprivation of his liberty requires a substantially greater likelihood of benefit to the public in order to enable it to survive his attack based upon Article I, § 19 of the Constitution of North Carolina.

*Id.* (emphasis added). This Court has also recognized that an order of the Commission is legislative in character and is therefore subject to the same constitutional tests and commands as is a legislative enactment issued under the state's police power. *See Utilities Commission v. R.R.*, 267 N.C. 317, 325-26, 148 S.E. 2d 210, 216 (quoting with approval, 73 C.J.S. *Public Utilities* § 41 at 1081), *modified on other grounds*, 268 N.C. 204, 150 S.E. 2d 337 (1966).

With these principles in mind, we hold the Commission's actions are not unconstitutional under either article I, section 10 of the United States Constitution or article I, section 19 of the North Carolina Constitution. First, the Commission's actions do not amount to an unconstitutional impairment of contract. Here the Commission's order requires NCNG to comply with the approved rate structure in existence when the two percent monies were collected from T-1 customers. The order, therefore, constitutes a lawful "enforcement" of the Commission's prior order entered in Docket No. G-21, Sub 235. *See Utilities Comm. v. Power Co.*, 285 N.C. at 406, 206 S.E. 2d at 290. In that docket, the Commission established the rates and rate structure which were in effect during the time period at issue in this proceeding. Notably, the IST mechanism was a part of NCNG's rate structure approved at that time. In addition, there is arguably no conflict between the Commission's order and the service contracts entered into between NCNG and its T-1 customers. The Commission's order does not require NCNG to give up the value of the two percent retained gas volumes contracted for. Rather, the order only requires NCNG to include the value of retained vol-

umes in the IST mechanism as is required of all other T-1 revenues less gross receipts tax. Assuming arguendo there is a conflict, the Commission's previously approved rate structure lawfully supersedes the terms of the private customer contracts. *See id.*

The Commission's actions also do not amount to an unconstitutional taking of property other than by the law of the land or to a taking without due process. Here the Commission's order is reasonable and its benefit to the public outweighs any deprivation of NCNG's constitutional rights. In reaching this conclusion, we again emphasize that the Commission's order, requiring the inclusion of the two percent monies in the IST, comports with NCNG's lawful rate structure previously approved by the Commission. In addition, we also rely on our decision in *Power Co.*, when this Court recognized the significant public good involved in the Commission's regulation of utility companies' private contracts affecting rates. *See id.* at 407, 206 S.E. 2d at 290-91. The following words from that decision are equally applicable to the Commission's present actions:

> It is in the *public interest* that a public utility company charge for its services rates which will enable it to maintain its financial ability to render adequate service and to attract the capital necessary for expansion and improvement of its service as needed. It is also in the *public interest* that there be no unreasonable discrimination between the users of such service. *The police power of the state extends to the raising of rates fixed by private contract so as to accomplish either or both of these purposes.*

*Id.* (emphasis supplied).

We hold, on this record, the Commission's actions do not amount to an impairment of contract in violation of article I, section 10, of the United States Constitution nor an unlawful taking of property other than by the law of the land or without due process in violation of article I, section 19 of the North Carolina Constitution.

In conclusion and for the reasons stated, we hold that the Commission did not err in this proceeding. Its order is, therefore,

Affirmed.